Shavar Jeffries (SJ-0360)
Scott Michelman, admitted *pro hac vice*
Megan Grandinetti, D.N.J.L. Civ. R. 101.1(h)
Shelley Prysant, D.N.J.L. Civ R. 101.1(h)
Matthew Schueller, D.N.J.L. Civ. R. 101.1(h)
**SETON HALL UNIVERSITY SCHOOL OF LAW**
**CENTER FOR SOCIAL JUSTICE**
833 McCarter Highway
Newark, New Jersey 07102
(973) 642–8700

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| VERONICA WILLIAMSON<br><br>                Plaintiff,<br><br>      v.<br><br>NEWARK PUBLIC SCHOOLS; MARION A. BOLDEN, State District Superintendent, Newark, Public Schools; LYDIA SILVA, Assistant Superintendent, School Leadership Team IV; ROY T. WILSON, Principal, Dr. E. Alma Flagg Elementary School,<br><br>              Defendants. | **CIVIL ACTION NO: 05-4008**<br><br><br>**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON HER COMPLAINT AND MOTION FOR SUMMARY JUDGMENT ON WILSON'S COUNTERCLAIMS** |

**TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................................ii

TABLE OF AUTHORITIES ..........................................................................................ii

LEGAL AND FACTUAL BACKGROUND .................................................................. 3

PROCEDURAL HISTORY ........................................................................................... 23

ARGUMENT.................................................................................................................. 23

I.    AS A MATTER OF LAW, PLAINTIFF HAS ESTABLISHED A FIRST
      AMENDMENT RETALIATION CLAIM AGAINST WILSON, BOLDEN, AND NPS
      FOR BANNING HER FROM THE FLAGG SCHOOL.................................................. 24

      A.    Wilson Violated Ms. Williamson's First Amendment Right To Be Free From
            Retaliation For Her Speech Because She Engaged In Protected Speech,
            Wilson Responded With Retaliation, and Ms. Williamson's Protected Speech
            Caused The Retaliation. ................................................................................. 24

            1.  Ms. Williamson's speech criticizing the performance of Wilson is
                protected by the First Amendment............................................... 24

            2.  Wilson responded to Williamson's protected speech by banning her from
                Flagg and by repeatedly harassing her in the following months. ............ 29

            3.  Wilson has admitted a causal link between Ms. Williamson's speech and
                his decision to ban her from the Flagg school. ......................................... 31

      B.    Bolden Is Liable for First Amendment Retaliation Because She Affirmed
            Wilson's Unconstitutional Decision To Ban Ms. Williamson........................ 32

      C.    NPS is Liable Because Its Final Policymaker Ratified Wilson's
            Unconstitutional Decision To Ban Ms. Williamson From The Flagg School.33

II.   MS. WILLIAMSON HAS ESTABLISHED AS A MATTER OF LAW THAT
      DEFENDANT WILSON UNCONSTITUTIONALLY PROHIBITED HER FROM
      DISTRIBUTING FLYERS AND THAT BOTH WILSON AND NPS ARE LIABLE
      FOR THIS UNCONSTITUTIONAL, VIEWPOINT-BASED PRIOR RESTRAINT
      OF SPEECH...................................................................................................... 34

      A.    Wilson's Prohibition Of Ms. Williamson's Distribution Of Flyers Violated
            Her  Free Speech Rights Because It Was Viewpoint-Based, Undertaken
            Pursuant To An Unconstitutional District Policy, And Unreasonable In Light
            Of The Nature Of The Forum. ....................................................................... 35

1. Wilson prohibited Plaintiff from distributing flyers solely to suppress her point of view because he did not consider it "evidence-based." ............... 35

2. The NPS policy regarding distribution of flyers is unconstitutional on its face because Wilson possesses unfettered discretion to approve material for distribution. ....................................................................................... 38

3. Wilson's suppression of Ms. Williamson's flyers was unconstitutional because it was unreasonable in light of the nature of the forum. .............. 41

B. NPS Is Liable For The Suppression Of Williamson's Flyers Because NPS Delegated Final Decision-making Authority To Wilson And So His Actions And Policies Prohibiting Flyer Distribution Constitute Actions Of NPS, And Because The Suppression Occurred Pursuant To The District's Own Unconstitutional Policy .................................................................................. 43

III. WILLIAMSON HAS ESTABLISHED AS A MATTER OF LAW THAT DEFENDANTS' CANCELLATION OF THE SPRING 2005 PTSO MEETINGS VIOLATED HER FIRST AMENDMENT RIGHT TO FREE SPEECH AND ASSEMBLY. ............................................................................................. 45

A. Wilson's Cancellation Of The March 17, 2005 PTSO Meeting And Constructive Cancellation Of Subsequent Meetings Were Unconstitutional Because They Were Viewpoint-Based, Unreasonable In Light Of The Nature Of The Forum, And Carried Out Pursuant To An Unconstitutional District Policy. ........................................................................................................ 45

1. The PTSO meeting cancellations were viewpoint-based .......................... 45

2. The PTSO meeting cancellations were unreasonable in light of the nature of the forum. ............................................................................................ 47

3. NPS's school-facilities policy is facially unconstitutional because it grants Wilson unfettered discretion to approve the use of school facilities. ....... 48

B. Silva Is Liable For The Cancellation Of The PTSO Meetings Because She Made The Cancellation Decision Together With Wilson. .............................. 49

C. NPS Is Liable For Cancelling The PTSO Meetings Because It Delegated Final Decisionmaking Authority To Wilson And/Or Silva, Who Jointly Made The Cancellation Decision, And Because The Decision Was Made Pursuant To The District's Unconstitutional Meetings Policy. ........................................... 50

IV.      MS. WILLIAMSON IS ENTITLED TO SUMMARY JUDGMENT ON WILSON'S
DEFAMATION COUNTERCLAIM BECAUSE THE FACTS CANNOT SHOW,
BY CLEAR AND CONVINCING EVIDENCE, THAT THE ALLEGEDLY
DEFAMATORY STATEMENTS WERE MADE WITH ACTUAL MALICE........ 51

      A.     Wilson Is A Public Official Because He Holds An Important Public Office
That Implicates The Critical Government Function Of Educating Children.. 51

      B.     Wilson's Defamation Claims Fail As A Matter Of Law Because There Is No
Clear And Convincing Evidence Of Actual Malice By Ms. Williamson. ...... 53

V.      MS. WILLIAMSON IS ENTITLED TO JUDGMENT ON WILSON'S
MALICIOUS-PROSECUTION COUNTERCLAIM BECAUSE HE CANNOT
ESTABLISH THE "SPECIAL GRIEVANCE" REQUIRED BY NEW JERSEY
LAW. ................................................................................................................... 55

CONCLUSION..................................................................................................................... 56

# TABLE OF AUTHORITIES

## FEDERAL CASES

<u>**CASES**</u>                                                                 <u>**PAGE(S)**</u>

*A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Ctr.*,
    372 F.3d 572 (3d Cir. 2004)................................................................32, 49

*Ambach v. Norwick*,
    441 U.S. 68 (1979).............................................................................51

*Anderson v. Davila*,
    125 F.3d 148 (3d Cir. 1997)..................................................... 24, 29, 31-32

*Andrews v. City of Phila.*,
    895 F.2d 1469 (3d Cir. 1990)...........................................................32, 34

*Atlanta Journal & Const. v. City of Atlanta Department of Aviation*,
    322 F.3d 1298 (11th Cir. 2003) ............................................................38

*Baker v. Monroe Tp.*,
    50 F.3d 1186 (3d Cir. 1995)............................................................32, 49

*Brown v. Board of Education*,
    347 U.S. 483 (1954).............................................................................51

*Burson v. Freeman*,
    504 U.S. 191 (1992)........................................................................24, 26

*Bystrom v. Fridley High Sch.*,
    822 F.2d 747 (8th Cir. 1987) ...............................................................39

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)............................................................................23

*Child Evangelism Fellowship of Md., Inc. v. Montgomery County Public Schools*,
    457 F.3d 376 (4th Cir. 2006) ...............................................................38

*Child Evangelism Fellowship of N.J., Inc. v. Stafford Tp. Sch. District*,
    386 F.3d 514 (3d Cir. 2004)................................................................43

*Child Evangelism Fellowship of S.C. ("CEF-SC") v. Anderson Sch. District Five*,
    470 F.3d 1062 (4th Cir. 2006) .......................................................38-39, 48-49

v

*Chiu v. Plano Independent Sch. District*,
    339 F.3d 273 (5th Cir. 2003) ...................................................39

*City of Lakewood v. Plain Dealer Public Co.*,
    486 U.S. 750 (1988)...................................................................46

*City of St. Louis v. Praprotnik*,
    485 U.S. 112 (1988)............................................................33, 43

*Cornelius v. NAACP Legal Defense & Education Fund, Inc.*,
    473 U.S. 788 (1985)....................................................35, 37, 45

*DeBoer v. Village of Oak Park*,
    267 F.3d 558 (7th Cir. 2001) ...................................................38

*Donovan v. Punxsutawney Area Sch. Board*,
    336 F.3d 211 (3d Cir. 2003)................................................41, 47

*Eisner v. Stamford Board of Education*,
    440 F.3d 803 (2d Cir. 1971)......................................................39

*El v. S.E. Pa. Transport Authority*,
    479 F.3d 232 (3d Cir. 2007)......................................................28

*Farrell v. Planters Lifesavers Co.*,
    206 F.3d 271 (3d Cir. 2000)......................................................31

*Forsyth County v. Nationalist Movement*,
    505 U.S. 123 (1992)...........................................................38, 41, 48

*Freedman v. Maryland*,
    380 U.S. 51 (1965)....................................................................38

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974)..................................................................37

*Gregoire v. Centennial Sch. District*,
    907 F.2d 1366 (3d Cir. 1990)............................................. 41-42

*Hill v. Borough of Kutztown*,
    455 F.3d 225 (3d Cir. 2006).................................33, 43-44, 50-51

*Johnson v. Robbinsdale Independent Sch. District Number 281*,
    827 F. Supp. 1439 (D. Minn. 1993)..........................................51

*Lamb's Chapel v. Center Moriches Union Free School District,*
    508 U.S. 384 (1993)..................................................................................35, 37, 45

*Lewis v. Wilson,*
    253 F.3d 1077 (8th Cir. 2001) .......................................................................38

*M.B. ex rel. Martin v. Liverpool Central Sch. District,*
    487 F. Supp. 2d 117 (N.D.N.Y. 2007)...........................................................39

*McGreevy v. Stroup,*
    413 F.3d 359 (3d Cir. 2005)...............................................33, 43-44, 50-51

*McMillian v. Monroe County,*
    520 U.S. 781 (1997)........................................................................................33

*Monell v. Department of Social Services,*
    436 U.S. 658 (1978)........................................................................................44

*NAACP v. Button,*
    371 U.S. 415 (1963)........................................................................................51

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964)............................................................................ 25-26, 51

*Nitzberg v. Parks,*
    525 F.2d 378 (4th Cir. 1975) .........................................................................39

*Peachlum v. City of York,*
    333 F.3d 429 (3d Cir. 2003)............................................................... 38, 40-41

*Pembaur v. City of Cincinnati,*
    475 U.S. 469 (1986)..................................................................................33, 43

*Plyler v. Doe,*
    457 U.S. 202 (1982)........................................................................................51

*Rankin v. McPherson,*
    483 U.S. 378 (1987)................................................................................. 25-26

*Riseman v. Sch. Committee of City of Quincy,*
    439 F.2d 148 (1st Cir. 1971)..........................................................................39

*Rivera v. E. Otero Sch. Dist.,*
    721 F. Supp. 1189 (D. Colo. 1989)................................................................39

*Robinson v. S.E. Pa. Transport Authority*,
    982 F.2d 892 (3d Cir. 1993)..................................................................31

*Rosenberger v. Rector & Visitors of University of Va.*,
    515 U.S. 819 (1995)..........................................................................43

*Shanley v. N.E. Independent Sch. District*,
    462 F.2d 960 (5th Cir. 1972) .......................................................... 39-40

*Shuttlesworth v. City of Birmingham*,
    394 U.S. 147 (1969)........................................................................48-49

*Estate of Smith v. Marasco*,
    318 F.3d 497 (3d Cir. 2002)...........................................................24, 31

*Stevens v. Tillman*,
    855 F.2d 394 (7th Cir. 1988) ...............................................................51

*Summum v. Callaghan*,
    130 F.3d 906 (10th Cir. 1997) .............................................................38

*United States v. Kalb*,
    234 F.3d 827 (3d Cir. 2000)................................................................46

*Watts v. United States*,
    394 U.S. 705 (1969).......................................................................25-26

*Westfield High Sch. L.I.F.E. Club v. City of Westfield*,
    249 F. Supp. 2d 98 (D. Mass. 2003) ............................................... 39-40

**STATE CASES**

*Abbott v. Burke*,
    153 N.J. 480 (1998) ..........................................................................52

*Brien v. Lomazow*,
    227 N.J. Super. 288 (App. Div. 1988) ...............................................56

*Costello v. Ocean County Observer*,
    136 N.J. 594 (1994) ......................................................................52-53

*DeAngelis v. Hill*,
    180 N.J. 1 (2004) ...................................................................51, 53-54

*Gonzalez v. State Operated Sch. District of City of Newark*,
    345 N.J. Super. 175 (App. Div. 2001) ............................................................33

*Karins v. City of Atlantic City*,
    152 N.J. 532 (1998) ......................................................................................24

*Klesh v. Coddington*,
    295 N.J. Super. 1 (App. Div. 1996) ..............................................................56

*Lind v. Schmid*,
    67 N.J. 255 (1975) ........................................................................................55

*Lynch v. N.J. Education Association*,
    161 N.J. 152 (1999) ................................................................................51, 53

*Palmer v. Bennington Sch. District*,
    615 A.2d 498 (Vt. 1992) ...............................................................................52

*Penwag Prop. Co. v. Landau*,
    76 N.J. 595 (1978) ........................................................................................55

*Reaves v. Foster*,
    200 So. 2d 453 (Miss.1967) ..........................................................................52

*Senna v. Florimont*,
    2007 WL 1542017 (N.J. App. Div. May 30, 2007), cert. granted, 192 N.J. 477 ..............52

*Skeens v. Shetter*,
    2006 WL 827782 (D.N.J. Mar 30, 2006) ......................................................55

*State v. Defley*,
    395 So. 2d 759 (La. 1981) .............................................................................52

*Turner v. Wong*,
    363 N.J. Super. 186 (App. Div. 2003) ..........................................................56

*Vickey v. Nessler*,
    230 N.J. Super. 141 (App. Div. 1989) ..........................................................55

*Williams v. Detroit Board of Education*,
    2007 WL 3202992 (E.D. Mich. Oct. 30, 2007) ............................................52

## FEDERAL STATUTES

Fed.R.Civ.P. 56(c) .........................................................................................23

## PRELIMINARY STATEMENT

Newark Public Schools ("NPS") maintains that parental involvement is "critical" to the success of its schools. Toward that end, NPS "welcomes" parent visits to its schools under its open-door policy, encourages vibrant parent organizations, and promotes a "sense of ownership" by parents of the school itself by inviting parent organizations to use school facilities. Based on the value NPS places on engaged parents, Veronica Williamson should be worth her weight in gold. She was the elected President of the Parent Teacher Student Organization ("PTSO") at the Dr. E. Alma Flagg Elementary School, the school's only organization, during the time relevant here, representing the parents of the school's 600 children. As President, Williamson transformed a dormant organization into one in which almost 100 parents turned out regularly for meetings and school activities. Parents uniformly praised Williamson's leadership and considered her an indispensable voice for Flagg's parents and children.

But for new Flagg principal Roy Wilson, Williamson's advocacy was a nuisance. Wilson, who became principal in September 2004, does not tolerate dissent and retaliates forcefully against those who question him. Superintendent Marion Bolden, adopting the findings of NPS's affirmative-action officer, found that Wilson had retaliated against a teacher who rebuffed his command not to file a police report after several students threatened her life. Substantiating the complaint, Bolden adopted the officer's finding that Wilson "unjustly targeted [the teacher] in a manner that is obviously intended to sabotage her career," and the officer's broader finding that Wilson "is likely to come confrontational whenever he feels he is being challenged." These findings about Wilson's retaliatory disposition are verified by the staff who work under him. The record before this court shows no fewer than seven staff members — including six teachers — who directly attest to harassment or retaliation by Wilson in the short three years he has been principal. NPS's Superintendent; NPS's affirmative-action officer; at least six of his teachers; one of his custodians: a broad consensus confirms that Wilson reacts swiftly and vengefully when he is questioned in any way.

1

Williamson would personally experience Wilson's retaliatory ways.  In late 2004 and early 2005, reacting to reports of environmental deficiencies in several district schools, Williamson requested information about Flagg's air and water quality.  Despite Williamson's role as President of the school's sole parent organization, and parents' undeniable interest in the safety of their children, Wilson pointedly told her that such inquiries were not her business.  After Williamson discussed environmental concerns at a subsequent PTSO meeting, Wilson announced his opposition to Williamson's candidacy for re-election as PTSO President, notwithstanding NPS's clear policy prohibiting administrators from interfering with the operations of parent organizations.  A week later, in early March, Wilson told Williamson she could not visit her son's classrooms, even though her son's teachers requested her visits so that she could better support her son with his homework.   Disturbed by Wilson's growing antagonism as well as his leadership of the school, Williamson spoke to Wilson's direct supervisor, Defendant Lydia Silva, on March 11 about these concerns.

On March 15, the next time Williamson saw Wilson, he would indefinitely ban her from entering the school.  According to Wilson's own memo, he did so because after he told Williamson that her son would be leaving the school if he did not attend detention, Williamson responded that "you will be leaving before [my son] does since you don't do your job."   From March 15, 2005 until her son transferred from Flagg in the spring of 2006, Wilson would consistently remove Williamson from the school when she visited, despite an April 11, 2005 agreement between Williamson and the District permitting her to re-enter.  In fact, from mid-April 2005 until the end of that school year, Wilson forced Williamson from the school on at least eight separate occasions.  Along with the ban from the school, Wilson cancelled, directly or constructively, several meetings of the Flagg PTSO, and prohibited Williamson from distributing PTSO-related flyers on school grounds.  By the time Wilson was finished, Williamson and the PTSO — for years strong voices for the interests of Flagg's parents and children — were silenced.

These facts entitle Williamson to summary judgment on her First Amendment claims.

The undisputed facts show the following:

- Wilson violated Williamson's First Amendment right to be free from retaliation because she engaged in protected speech critical of his performance and Wilson responded by denying her a series of benefits, including access to the school, along with the ability to distribute flyers and hold PTSO meetings on school grounds. Bolden is liable for this conduct because she knew of and acquiesced in it; and NPS is also liable because its final policymaker, Bolden, officially adopted Wilson's unconstitutional action.

- Wilson prohibited Williamson from distributing PTSO-related flyers because he disagreed with the opinions contained in the flyer. This conduct violated the First Amendment's prohibition on viewpoint discrimination and was inconsistent with the nature of the forum Wilson and the District created by permitting flyer distribution on school-related matters. The District is also liable because it delegated final decision-making power to Wilson and, alternatively, because he prohibited distribution of the flyers under a policy granting decision-makers unfettered discretion to suppress speech.

- Wilson cancelled several PTSO meetings because he disagreed with Williamson's advocacy. This conduct violated the First Amendment's prohibition on viewpoint discrimination and was inconsistent with the nature of the forum Wilson and the District created by permitting parent organizations to meet on school grounds. Silva too is liable for cancelling at least one of these meetings, as she jointly participated in the decision. The District, finally, is also liable because it delegated final decision-making power to Wilson or Silva, and alternatively because the meetings were cancelled under a policy granting decision-makers unfettered discretion to suppress speech and assembly.

In addition, Williamson is entitled to summary judgment on Wilson's counterclaims because the record does not reveal that she acted with actual malice and because Wilson does not assert a "special grievance" as required to support his malicious-prosecution claims.

Accordingly, this Court should grant Williamson's companion summary judgment motions. Defendants' actions have not only denied Williamson and the Flagg PTSO their First Amendment right to speak and assemble free from government interference, they have hamstrung parents' ability to advocate for their children.

## LEGAL AND FACTUAL BACKGROUND

### A.  Plaintiff Veronica Williamson

Veronica Williamson is the parent of two former students at the Dr. E. Alma Flagg Elementary School (hereinafter "Flagg" or "the Flagg school"), which is part of Defendant

Newark Public Schools (hereinafter "NPS" or "the District").[1]

Ms. Williamson, a former Flagg student herself,[2] was an active participant in the life of the school. Beginning in 2001, she was the president of the Flagg Parent Teacher Student Organization (hereinafter "PTSO"), a parent advocacy organization that was dormant prior to her ascendancy to the presidency.[3] She was also a member of the School Leadership Council (hereinafter "SLC"), a body composed of school staff and parents charged with setting academic and instructional priorities for the school. *See* N.J. Admin. Code § 6A:10A-5.3.[4]

As a parent leader, Ms. Williamson lobbied for improvements on a range of school-related issues, including student safety, budget, and academic performance.[5] Student performance was a particular concern. By the 2005-06 school year, Flagg was in its fifth year of being designated a failing school under the federal No Child Left Behind Act, meaning that Flagg's students were not obtaining the minimal skill set envisioned by federal law.[6]

Ms. Williamson's responsibilities as PTSO president periodically required her to challenge the effectiveness of the school's leadership. On one occasion, Ms. Williamson expressed parents' concern that a past principal was not an effective educational leader. The Assistant Superintendent apparently agreed, and demoted the principal.[7] Because she dependably advocated for the best educational and developmental interests of Flagg's children, parents and teachers consistently praise Williamson's leadership.[8]

---

[1] Jeffries Cert., Ex. A (Decl. of Veronica Williamson) (hereinafter "Williamson Decl.") ¶ 2.

[2] Jeffries Cert., Ex. N (Aug. 27, 2007, Dep. of Veronica D. Williamson) (hereinafter "Williamson Dep.") 21:12-18.

[3] Williamson Decl. ¶ 3; Jeffries Cert., Ex. O (Decl. of Tanya Early) (hereinafter "Early Decl.") ¶ 4.

[4] Williamson Decl. ¶ 6.

[5] Williamson Decl. ¶¶ 5, 11; Early Decl. ¶ 3; Jeffries Cert., Ex. P (Decl. of Linda Fraser) (hereinafter "Fraser Decl.") ¶ 2.

[6] *See Final School Improvement Status Summary: School Year 2005-2006*, Essex County, http://www.nj.gov/education/title1/accountability/profiles/05/final/sini13.pdf, at 125.

[7] Williamson Decl. ¶ 9; Jeffries Cert., Ex. C (Aug. 29, 2007, Dep. of Lydia Silva) (hereinafter "Silva Dep.") 51:11-52:10, 68:2-9.

[8] Fraser Decl. ¶ 2; Jeffries Cert., Ex. Q (Decl. of Juba Dowdell) (hereinafter "Dowdell Decl.") ¶ 14; Jeffries Cert., Ex. R (Decl. of Maryam Muhammad) (hereinafter Muhammad Decl.") ¶ 13.

In addition to her general advocacy on behalf of Flagg's parents and children, Williamson actively participated in the educational lives of her own children.  She engaged teachers in support of her children's education, and visited her children's classes — at the teacher's request — when they were experiencing academic difficulties.[9]

Given the range of her responsibilities as a parent leader and mother, Williamson was a regular visitor to the Flagg school, visiting several times a week from 2001 to 2005.[10]  These visits were invited by the District under its open-door visitation and use-of-facilities policies. The District specifically "welcomes visits by parents/guardians"[11] and, because it believes "[s]chools are a part of the community," the District "encourages the development of a sense of ownership" by parents and community members concerning access to and use of school facilities.[12]  Under these policies, Ms. Williamson, like many parents, regularly visited the school and conducted meetings of parent organizations on school grounds.

In her school visits and dealings with staff, long-time Flagg teachers describe Ms. Williamson as uniformly respectful, decent, and professional.[13]  In the words of one veteran teacher, Ms. Williamson "has always been devoted to Flagg and to ensuring that the children of the Flagg school receive the best education possible."[14]

### B.  Defendant Roy Wilson

In the fall of 2004, NPS hired Defendant Roy Wilson as principal of the Flagg school. Prior to being named principal, Wilson had been a high-school vice principal for two years with a quarter of his time devoted to discipline; and before that, a school-based disciplinarian at an

---

[9] Williamson Decl. ¶ 7.
[10] Williamson Decl. ¶ 8; Williamson Dep. 53:2-14, 40:21-41:11; Fraser Decl. ¶ 2.
[11] Jeffries Cert., Ex. J (Policy 1250, Visitors Policy)
[12] Jeffries Cert. Ex. I (Policy 1330, Use of School Facilities Policy).
[13] Fraser Decl. ¶ 2; Jeffries Cert., Ex. S (Decl. of Lydia Donofrio) (hereinafter "Donofrio Decl.") ¶ 4; Dowdell Decl. ¶ 14; Jeffries Cert., Ex.T (Decl. of Fletcher Stokley) (hereinafter "Stokley Decl.") ¶ 16; Muhammad Decl. ¶ 13.
[14] Fraser Decl. ¶ 2.

elementary school.[15]  He had no experience running an elementary school.

Wilson's presence dramatically changed the atmosphere at Flagg.  Numerous Flagg staff describe the six-foot-two, 217-pound Wilson[16] as violent, intimidating, dictatorial, and verbally abusive, a man who would use his size and demeanor to bully and physically intimidate.[17] Wilson made it unmistakably clear that he expected complete obedience from teachers and staff. He emphasized to his subordinates that they had better not "dare to question his commands,"[18] and that he "did not tolerate disagreement with anything he said."[19]

Staff describe intimidation and retaliation as Wilson's standard responses to even the slightest professional disagreement with any of his commands.  Teachers were "afraid to challenge any of Wilson's actions . . . , as [they] were uniformly certain that Wilson would seek to end the career of any teachers who dared" to do so.[20]  Teachers also felt "in danger of losing their jobs because of Wilson's unpredictable behavior."[21]  Teachers specifically report being disciplined or negatively evaluated by Wilson in retaliation for their attempts to assert their rights to superiors,[22] for refusing to comply with Wilson's arbitrary or unreasonable demands,[23] and for testifying as a witness in a District investigation of a complaint against him.[24]  When one teacher, for example, requested the presence of her union representative at a meeting in which she became afraid of Wilson because he was yelling and pointing his finger in her face, Wilson

---

[15] Jeffries Cert., Ex. B (Aug. 30, 2007, Dep. of Roy T. Wilson) (hereinafter "Wilson Dep.") 11:9-19:21.
[16] Wilson Dep. 217:15-18.
[17] Fraser Decl. ¶¶ 3, 5, 7, 10; Donofrio Decl. ¶ 2; Jeffries Cert., Ex. U (Decl. of Ryan Ward) (hereinafter "Ward Decl.") ¶ 2; Dowdell Decl. ¶¶ 2, 10; Muhammad Decl. ¶¶ 3-4, 9-12; Stokley Decl. ¶ 3-6; Montague Dep. 18:19-21:22.
[18] Muhammad Decl. ¶ 9.
[19] Stokley Decl. ¶ 1.
[20] Dowdell Decl. ¶ 2.
[21] Ward Decl.  ¶ 2.
[22] Dowdell Decl.  ¶¶ 4-7.
[23] Ward Decl. ¶¶ 3-6; Stokley Decl.  ¶¶ 8-14.
[24] Donofrio Decl.  ¶¶ 11-14.

responded by calling security to throw her out of the building.[25]  The District's own Affirmative-Action Officer even confirms Wilson's intimidating and retaliatory disposition.  After interviewing Wilson in connection with a teacher's harassment complaint, the Officer found that Wilson's behavior "supports" teachers' observations that Wilson is "likely to come confrontational whenever he feels he is being challenged."[26]  The District's superintendent, Defendant Marion Bolden, adopted this finding.[27]

Because of their constant fear of harassment and retaliation, teachers went to extraordinary lengths just to hold private conversations with one another about their concerns regarding Wilson's stewardship.  Flagg had a system of security cameras, to which Wilson had access through a monitor in his office,[28] and, to avoid Wilson's all-encompassing oversight, teachers would "regularly converse with one another in those few places in the building that were out of the cameras' sightlines."[29]  Given the hostility of the working environment, staff consistently describe morale under Wilson as the lowest they have seen in their professional careers — careers for several of the teachers spanning well over 20 years.[30]

Wilson's disposition has produced a steady stream of staff complaints of harassment, intimidation, and retaliation — several of which have been formally substantiated or otherwise vindicated by the District.  One teacher, Miriam Gladden, a graduate of Brown University and Columbia Law School, filed a harassment and retaliation complaint against Wilson after he gave her negative performance evaluations because she disregarded his instructions and filed a police report when a group of students had threatened her life.[31]  Substantiating Ms. Gladden's complaint, the District's Affirmative Action Officer found that she was "unjustly targeted [by

---

[25] Jeffries Cert., Ex. D (Oct. 18, 2007, Dep. of Sheila Montague) (hereinafter "Montague Dep.") 18:19-21:22.

[26] Jeffries Cert., Ex. W (Apr. 11, 2007, Pennington Report on Gladden Complaint) (hereinafter "Pennington Rpt."), at 111.

[27] *Id.* at 112.

[28] Wilson Dep. 103:23-104:2.

[29] Donofrio Decl. ¶ 3.

[30] Fraser Decl. ¶ 3; Donofrio Decl. ¶ 2; Dowdell Decl. ¶ 2; Ward Decl. ¶ 2; Decl. ¶ 1.

[31] Pennington Rpt., at 101; Jeffries Cert., Ex. X (Gladden Complaint).

Wilson] in a manner that is obviously intended to sabotage her career."[32]   The Officer further found that Wilson's retaliatory conduct exposed NPS to legal liability, and in potentially forcing Gladden from the District, jeopardized "a resource that promises to be of benefit to the students of the Newark Public Schools."[33]   Defendant Bolden, the District Superintendent, adopted Pennington's findings substantiating Gladden's complaint, and ordered Wilson to rescind the negative evaluations and undergo remedial training.[34]

Another teacher was given a negative performance evaluation after a fall 2005 confrontation in which Wilson demanded a present for his pregnant girlfriend and the teacher refused; Wilson later fired the teacher on the basis of this evaluation, but the teacher appealed the evaluation and the discharge, and the District reinstated the teacher.[35]   Yet another teacher assumed additional coaching duties for which Wilson did not pay him for nearly a year; four days after the teacher filed a union grievance to get his pay, Wilson wrote him up for insubordination in apparent retaliation for the grievance.   Defendant Lydia Silva, the Assistant Superintendent who supervises Wilson, ensured that Wilson's charge against the teacher "[would] not stick" and the District thereafter paid the teacher for his coaching duties.[36]

Perhaps most astonishing, Wilson physically assaulted another administrator in front of staff and students after the administrator rebuffed Wilson's orders about scheduling an office clean-up; the staff member who pulled Wilson off as he was choking and punching the other administrator recalled that Wilson loudly called the administrator a "nigger" and a "motherfucker," threatened to kill him, and, even after the fight had stopped, repeatedly challenged the man to step outside and continue the fight.[37]

Wilson is especially domineering and intimidating to women.   Wilson's bullying conduct

---

[32] Pennington Rpt., at 112.
[33] Pennington Rpt., at 112.
[34] Pennington Rpt., at 112.
[35] Ward Decl. ¶¶ 3-6
[36] Dowdell Decl. ¶¶ 4-8; Jeffries Cert., Ex. Y (Jan. 5, 2007 Dowdell/Parlapiano Grievance).
[37] Stokely Decl. ¶¶ 3-6; Donofrio Decl. ¶ 5; Pennington Rpt., at 111 (making note of this incident).

has reduced a number of women at Flagg to tears.[38]  The mere presence of Wilson would cause one female teacher to become "so nervous that [her] knees would get weak and [she] would get heart palpitations."[39]  Several female teachers were so anxiety-ridden by their constant fear of Wilson that they experienced panic attacks, nausea, or severe abdominal discomfort — harms causing these teachers to make hospital visits and to take sick days and miss school.[40]  One teacher, in addition, testified in her deposition that Wilson sexually harassed her by applauding as she walked by while gazing in a sexually provocative manner at her rear.[41]  The perspective of a star female Math teacher, a Governor's teaching award recipient who left the District because of Wilson's behavior, is a common description of the extent to which women were physically intimidated by Wilson:

> I feared for my safety whenever I was in Wilson's presence, and purposefully avoided being in any setting in which I was alone with him.  Because of his hostile tone and demeanor, coupled with his size and penchant for arbitrary behavior, I did not feel safe in his presence and was fearful that he might do me bodily harm.[42]

### C.  NPS's Supervision of Wilson

Wilson's direct supervisor is Defendant Lydia Silva, Assistant Superintendent for School Leadership Team IV ("SLT-IV").[43]  Silva has rated Wilson's performance as "proficient," which ranks him in the bottom half of principals within the fourteen schools of SLT-IV.[44]  Although Silva testified that she is always personally involved in handling complaints of inappropriate conduct by principals, Silva claimed in August 2007 to have no knowledge of Gladden's retaliation complaint against Wilson and formally sustained by the superintendent, and she

---

[38] Montague Dep. 18:19-19:14, 22:24-23:21, 30:23-31:9.
[39] Fraser Decl. ¶¶ 1, 3, 7.
[40] Muhammad Decl. ¶ 11; Montague Dep. 38:4-39:11; *see also* Jeffries Cert., Ex. Z (May 23, 2006, email of S. Montague to L. Silva) (hereinafter "Montague Email") (complaining of "ongoing harassment, perpetuated continuously by Mr. Wilson").
[41] Montague Dep. 18:19-21:23; 7:23-8:24.
[42] Muhammad Decl. ¶ 11.
[43] Wilson Dep. 20:22-25; Silva Dep. 6:21-7:21.
[44] Silva Dep.  19:2-7; 31:10-15.

testified that she did not learn of another complaint filed by a custodian against Wilson until June 2007, two months after the District Affirmative Action officer closed the file, despite having been copied on letters about both complaints in April 2007.[45]  Another Flagg teacher sent Silva an email in May 2006 complaining of "ongoing harassment" by Wilson; Silva replied that she would investigate, but as of October 2007, the teacher did not know of anything that had been done regarding her concerns, nor had she even received a further response from Silva about her complaint.[46]

Silva's immediate supervisor is Superintendent Dr. Marion Bolden.[47]

**D.  Ms. Williamson's Advocacy and Wilson's Hostility Toward Her Advocacy**

Ms. Williamson was on the selection committee that recommended Wilson's hire, and she recommended, based on the information before her, that Wilson should be selected.[48]  Upon Wilson's arrival in fall 2004, Ms. Williamson and Wilson initially supported each other in their collective goals and had a constructive working relationship.[49]  But conflict arose as Williamson and the parents she represented raised concerns about student performance and safety.

In the fall of 2004, the PTSO under Ms. Williamson's leadership requested information about the school's air and water quality after District reports suggested problems in these areas at District schools, including Flagg.[50]  Wilson told Ms. Williamson that he did not approve of her advocacy or information requests, and that she "had no business inquiring into these issues."[51]

---

[45] Silva Dep. 13:3-13, 101:19-102:21, 104:24-107:13, 110:3-21.
[46] Montague Email (complaining of "ongoing harassment, perpetuated continuously by Mr. Wilson"); Montague Dep. 26:17-28:13.
[47] Silva Dep. 7:22-23.
[48] Williamson Decl. ¶ 10; Silva Dep. 53:4-11.
[49] Wilson Dep. 129:22-135:4.
[50] Williamson Decl. ¶ 12; Jeffries Cert., Ex. GG (Mar. 16, 2004, letter from Superintendent Marion Bolden to parents) (discussing presence of lead in the water at certain District schools, including Flagg); Jeffries Cert., Ex. HH (Nov. 12, 2004, architects' report regarding HVAC upgrades at Flagg) ("The existing HVAC system is not adequate for the increased student population producing poor air quality.").
[51] Williamson Decl. ¶ 13.

The PTSO held a meeting in February 2005.[52]  Because Wilson did not approve of the planned discussion of environmental concerns, Wilson confronted Ms. Williamson shortly before the meeting and attempted (unsuccessfully) to dissuade her from discussing this topic.[53]  When Ms. Williamson later announced that she would seek reelection to the PTSO presidency, Wilson stood up and publicly opposed her candidacy,[54] despite the District's policy prohibiting administrators from interfering in the operations of parent organizations.[55]

In the three weeks after Wilson announced his opposition to Ms. Williamson's reelection, his hostility escalated.  In early March, at the request of two of her son's teachers, Ms. Williamson visited her son's classrooms on several occasions to assist with his studies.[56]  She had regularly visited his classes in the past, usually at the teacher's request, and these early March 2005 class visits were no different.[57]

During one of these visits, Wilson arrived to observe the classroom.[58]  As Ms. Williamson rose to leave, Wilson stood behind her and, with his midsection in her face, prevented her from getting up even after she asked him repeatedly to move.[59]  After struggling to get up from her chair, Ms. Williamson left the classroom and the building.[60]

Later that day, Wilson informed Ms. Williamson that she would not be permitted to visit her son's classes anymore.  He later explained that he made this decision because she had

---

[52] Wilson Dep. 143:7-11.

[53] Wilson Dep. 143:12-23, 148:7-15; Williamson Decl. ¶ 15.

[54] Early Decl. ¶ 6; Williamson Decl. ¶ 15.

[55] Jeffries Cert., Ex. G (NPS Policy 1230, "School-Connected Organizations") (hereinafter "Policy 1230").

[56] Jeffries Cert., Ex. K (Mar.-June 2005 diary of Veronica Williamson) (hereinafter "Williamson Diary"), at 402 (entries for Mar. 2-4, 2005); Williamson Decl. ¶ 16; *see also* Williamson Decl. ¶ 52 (noting that Ms. Williamson records in the diary events that happen to her on the day they occur).

[57] Williamson Decl. ¶ 16.

[58] Wilson Dep. 188:21-25.

[59] Williamson Decl. ¶ 17.

[60] Williamson Diary, at 402 (entry for Mar. 4, 2005); Williamson Dep. 93:24-95:19; *see also* Jeffries Cert., Ex. II (Mar. 4, 2005, Report of Dr. Norma Fair-Brown) (hereinafter "Fair-Brown Report"), at 103 (noting Ms. Williamson's account that "Mr. Wilson stood over her in the classes until she asked him to '…move to the side…'").

reportedly been taking notes during class,[61] which he claimed violated the teachers' union contract.[62]   Wilson neither explains how parents are subject to the District's collective-bargaining agreements with its teachers, nor, in any event, can he confirm that Ms. Williamson's notes were evaluative in nature.

On March 10, 2005, Ms. Williamson visited Flagg, but Wilson followed her around the building; feeling uncomfortable, she left.[63]

Troubled by Wilson's increasing hostility and physical intimidation, Ms. Williamson discussed her concerns with Dr. Norma Fair-Brown, the assistant to one of Wilson's superiors, on March 4,[64] and with Wilson's direct supervisor, Defendant Silva, on March 11.[65]   Wilson was aware Ms. Williamson had contacted Dr. Fair-Brown, and he discussed Ms. Williamson's visits to the school with Silva during the first half of March.[66]   As noted, Wilson's practice is to strike back when individuals go to his supervisors or lodge complaints about his performance.[67]

### E.  The Ban Against Ms. Williamson And Other Retaliatory And Speech-Suppressive Actions

#### 1.  The March 15 Ban

On March 15, 2005, Ms. Williamson and Defendant Wilson had a conversation in which Ms. Williamson disagreed with a decision to discipline her son.  During this conversation, Ms. Williamson criticized Wilson's performance as principal, and Wilson responded by banning Ms. Williamson from returning to Flagg.

There is no dispute about the substance of the conversation precipitating the ban: the

---

[61] Wilson Dep. 194:16-22.

[62] Wilson Dep. 170:9-14.

[63] Williamson Diary, at 403 (entry for Mar. 10, 2005); Williamson Decl. ¶ 19.

[64] Williamson Decl. ¶ 18.

[65] Williamson Diary, at 402-03 (entries for Mar. 4 & 11, 2005); Fair-Brown Report, at 103; Silva Dep. 61:21-25; Williamson Decl. ¶ 21.

[66] Wilson Dep. 194:23-195:5, 205:14-17.

[67] Dowdell Decl. ¶¶ 4-7; Pennington Rpt., at 110 ("Ms. Gladden's record suggests that, prior to 'going over the head' of her principal, she could do no wrong; however, it appears that after going over his head, she could do no right.").

events are recorded in two contemporaneous eyewitness accounts, one written by Wilson himself and the other by Vice-Principal John Silveira.  These accounts report that on the afternoon of March 15, Ms. Williamson spoke with Silveira and disagreed with his decision to give her son a detention, because she suspected her son was being unfairly singled out.[68]  Wilson joined the conversation and then told Ms. Williamson that, based on *her* actions, Wilson would support increasing her son's punishment to a one-day suspension.[69]  Ms. Williamson responded that she intended to send her son to school the next day, and Wilson replied that he would send her son home if he came.[70]  Ms. Williamson replied that Wilson would be "leaving before he [i.e., her son] does" "since you don't do your job."[71]  Wilson responded by informing her that "because of [your] comments toward me, [you] would not be permitted back into the building."[72]  Wilson and Silveira acknowledge that the only basis of Wilson's March 15, 2005 ban was this exchange, and this was the sole "threat" made by Ms. Williamson.[73]

Wilson later told Loucious Jones, a school advocate who spoke with him on behalf of Ms. Williamson, "that Williamson was banned because she was 'asking too many questions' and that she had no right to criticize him."[74]  Wilson said further that "he did not like Williamson, he did not like her attitude, did not like her organizing style and did not like her personality" and that she "was asking for too much documentation" on the school's test scores and air and water quality.[75]  Vice Principal Silveira, a witness to the conversation in which Ms. Williamson was

---

[68] Jeffries Cert., Ex. L (memorandum of Roy T. Wilson reporting incident of March 15, 2005) (hereinafter "Wilson Ban Memo."), at 3; Jeffries Cert., Ex. M (Mar. 15, 2005, memorandum of John A. Silveira to Mr. Wilson) (hereinafter "Silveira Ban Memo."), at 5-6.

[69] Wilson Ban Memo., at 3; Silveira Ban Memo., at 6.

[70] Wilson Ban Memo., at 4; Silveira Ban Memo., at 6.

[71] Wilson Ban Memo., at 4; Silveira Ban Memo., at 6; Wilson Dep. 161:11-19, 163:16-164:2 (attesting to accuracy of his own account); Wilson Dep. 166:10-15 (attesting to accuracy of Silveira memorandum); Jeffries Cert., Ex. E (Aug. 23, 2007, Dep. of John A. Silveira) (hereinafter "Silveira Dep.") 40:17-41:25 (attesting to the accuracy of his own account and noting that it was written the day of the incident); *see also* Williamson Decl. ¶ 22.

[72] Wilson Ban Memo., at 4; *see also* Silveira Ban Memo., at 6.

[73] Wilson Dep. 169:5-10, 163:16-164:14; Silveira Dep. 44:19-45:7, 61:1-9.

[74] Jeffries Cert., Ex. LL (Decl. of Loucious Jones) (hereinafter "Jones Decl.") ¶ 4.

[75] Jones Decl. ¶ 4

banned, explained the ban this way:  "[Ms. Williamson] ha[d] no authority or right to make that type of comment.  So, the fact that she did definitely crossed the line as to what her role as either a parent or PTSO President would do and would definitely cause concern."[76]

Wilson now claims that he banned Ms. Williamson because he interpreted the March 15, 2005 statement as a threat of "bodily harm or death."[77]  According to Wilson, Ms. Williamson's statement that he would be "leaving" Flagg because of his poor job performance amounted to a death threat because, in Wilson's words, "if I'm not going to be here next year, then I'm not going to be here next year."[78]  Despite the gravity of his purported fear, Wilson mentions no such thing in his contemporaneous memorandum describing the March 15 incident,[79] nor does Superintendent Bolden recall Wilson mentioning this alleged death threat.[80]

In addition, Wilson does not recall ever seeking a restraining order[81] and, in any event, Ms. Williamson was never served with one.[82]  Silveira, the only other witness to the conversation, characterized Ms. Williamson's statement as "inappropriate" in light of Ms. Williamson's lack of supervisory "authority" over Wilson,[83] not in terms of a threat of death or bodily harm.[84]  The subsequent agreement by which the District purported to lift the ban against Ms. Williamson, signed by Ms. Williamson and Defendant Bolden, makes no mention of any threats made by Williamson.[85]  Despite this purported fear of death or bodily harm, Wilson

---

[76] Silveira Dep. 39:12-20.
[77] Wilson Dep. 159:17-23, 164:9-14.
[78] Wilson Dep. 160:4-5.
[79] Wilson Ban Memo., at 4; Wilson Dep. 161:11-19.
[80] Jeffries Cert., Ex. F (Oct. 11, 2007, Dep. of Marion A. Bolden) (hereinafter "Bolden Dep.") 35:22-36:4.
[81] Wilson Dep. 254:15-25.
[82]  Williamson Dec. ¶ 26.
[83] Silveira Dep. 37:12-15, 39:16-20.
[84] Silveira Dep. 37:16-18.
[85] Jeffries Cert., Ex. AA (Apr. 11, 2005, Agreement between Veronica Williamson and NPS) (hereinafter "Settlement Agreement").

affirmatively sought out her Ms. Williamson's presence on several occasions, including one instance in he specifically instructed his staff that "she is to meet with me only."[86]

The District promptly ratified Wilson's indefinite ban of Ms. Williamson: the final decision was made be Superintendent Bolden, and she acknowledges acting on behalf of "the District."[87]

### 2.  Retaliation and Other Events Subsequent to the March 15 Ban

After banning Ms. Williamson from the school on March 15, Wilson and Silva then cancelled a PTSO meeting scheduled for March 17.[88]  In twelve years, Silva had only canceled one other PTSO meeting, and she acknowledged that cancellation of PTSO meetings by principals is "unusual."[89]  Wilson's reason for the cancellation was "the climate that had begun to surface regarding Ms. Williamson and myself,"[90] along with the fact that she was banned from the school and he believed there were no PTSO members who could assume responsibility for the building during the meeting.[91]  Wilson did not try to contact any PTSO officers or members to see if they could assume charge of the building.[92]  At the time of the meeting cancellation, the PTSO officers included, in addition to Ms. Williamson, Tanya Early and Madeline DiBugno.[93]

Because of the ban, Ms. Williamson was also unable to attend a March 17 SLC meeting.[94]

On April 11, 2005, the District and Ms. Williamson entered into a Settlement Agreement permitting Ms. Williamson to return to the building and requiring her to be treated in accordance

---

[86] Jeffries Cert., Ex. BB (June 10, 2005, memorandum of Roy T. Wilson) ("Wilson June 10 Memo."); see *also* Wilson Dep. 236:7-237:1, 222:22-223:5.
[87] Bolden Dep. 18:8-20; Silva Dep. 71:9-25.
[88] Wilson Dep. 240:4-6; Silva Dep. 43:1-44:17; Williamson Decl. ¶ 24; Jeffries Cert., Ex. CC (Feb. 17, 2005, Application for Use of Auditoriums, Gymnasiums, etc., by Flagg PTSO) (hereinafter "PTSO Facilities Application").
[89] Silva Dep. 46:17-47:25.
[90] Wilson Dep. 240:7-9.
[91] Wilson Dep. 240:4-241:20.
[92] Wilson Dep. 245:16-246:7.
[93] Williamson Decl. ¶ 4.
[94] Williamson Decl. ¶ 24.

with District policies and to be free from impermissible exclusions from the building or other retaliation by Wilson.[95]  Nonetheless, in violation of the agreement, Wilson thereafter repeatedly banned Ms. Williamson from the building — on no fewer than 11 different occasions — and retaliated against her in a variety of other ways.[96]  In fact, Wilson banned Ms. Williamson from the building, either personally or by proxy, "pretty much every time" she tried to enter.[97]

Also on on April 11, 2005, the day the Settlement Agreement was signed, Ms. Williamson attempted to enter the building but was denied admission.[98]  The following week, on April 18, 2005, Ms. Williamson attempted to visit again.  Two District employees found Ms. Williamson in the library and told her that Wilson wanted her out of the building; one of the employees reported that Wilson had not received the settlement agreement allowing her back into the building.[99]

Beginning with Ms. Williamson's first visit after the ban was theoretically lifted, and continuing with each time she subsequently visited the school, the school's sign-in and visitation-pass procedures were also applied unevenly to Ms. Williamson.  At the beginning of Wilson's tenure, numerous visitors entered Flagg without signing-in or following other aspects of the District's visitation policies.[100]  Around March 8, 2005, Wilson implemented a new policy requiring sign-in, statement of a purpose and location, and pass issuance.[101]  Ms. Williamson, fearing that the new policy was directed at limiting her access to the school, always complied with the policy's terms.[102]  Other parents were not required to sign-in except when they entered with Ms. Williamson.[103]  Vice Principal Silveira admits he does not know if every visitor abides

---

[95] Settlement Agreement, ¶ 2.

[96] Williamson Decl. ¶ 27.

[97] Williamson Dep. 57:25.

[98] Williamson Diary, at 408 (entry for Apr. 11, 2005); Williamson Decl. ¶ 28; Wilson Dep. 208:22-209:13.

[99] Williamson Dep. 55:10-57:2; Williamson Diary, at 409 (entry for Apr. 18, 2005); Williamson Decl. ¶ 29.

[100] Silva Dep. 87:6-8; Wilson Dep. 46:22-47:18; Early Decl. ¶ 7; Williamson Decl. ¶ 20.

[101] Williamson Decl. ¶ 20; Wilson Dep. 41:10-45:24.

[102] Williamson Decl. ¶ 20; Early Decl. ¶ 8.

[103] Williamson Decl. ¶ 20; Early Decl. ¶ 8.

by Wilson's visitor policy,[104] and does not know of any occasions when Ms. Williamson did not sign in.[105]

When Ms. Williamson visited the school on April 27, 2005, Wilson approached her while she was alone in the library.[106]  Wilson, once again, stood directly behind Ms. Williamson, who was sitting in a chair, and said in a low voice words to the effect that he would make her son's disciplinary problems go away if she slept with him.[107]  As she had on March 4, Ms. Williamson once again struggled to get up from her chair and to flee from Wilson, who would not move out of her way.[108]  As soon as she could, she made her way up and fled the building; Wilson followed right behind her down to the first floor.[109]  Ms. Williamson felt scared, trapped, and alone as a result of this unseemly advance.[110]

Wilson denies that he propositioned Ms. Williamson.[111]  Wilson testified that Ms. Williamson's removal was based on an unwritten policy excluding parents from the library during instructional time.[112]  Yet this purported policy is not only unwritten and uncodified, but it was never communicated to parents.[113]  In fact, prior to the ban, Ms. Williamson and other parents regularly visited the library during instructional time.  And, even after the ban, parents other than Ms. Williamson often visited the library during instructional time.[114]

On the same day that Wilson inappropriately propositioned her, Ms. Williamson filed a

---

[104] Silveira Dep. 25:9-15.
[105] Silveira Dep. 64:16-19.
[106] Wilson Dep. 210:14-25; Williamson Diary, at 410 (entry for Apr. 27, 2005); Williamson Decl. ¶ 30; Williamson Dep. 96:9-98:19; Jeffries Cert., Ex. FF (Sep. 13, 2006, handwritten statement of Veronica Williamson to municipal court) (hereinafter "Williamson Statement to Municipal Court"); *see also* Williamson Decl. ¶ 53 (explaining circumstances of September 13 statement).
[107] Williamson Diary, at 410 (entry for Apr. 27, 2005); Williamson Decl. ¶ 30; Williamson Dep. 96:9-98:19; Williamson Statement to Municipal Court.
[108] Williamson Decl. ¶ 30.
[109] Williamson Decl. ¶ 30.
[110] Williamson Decl. ¶ 30.
[111] Wilson Dep. 218:19-25.
[112] Wilson Dep. 211:25-212:6.
[113] Early Decl. ¶ 9. Williamson Decl. ¶ 33; *see also* Wilson Dep. 212:24-213:2, 213:8-10.
[114] Early Decl. ¶ 9; Williamson Decl. ¶ 33.

*pro se* municipal complaint against him that very day.[115]  After this complaint was dismissed because Williamson mistakenly filed it under a domestic violence statute, she tried filing again; the second complaint, too, was dismissed, for technical reasons Ms. Williamson cannot recall.[116] Ms. Williamson reported Wilson's sexual advance immediately to her friend Donna Jackson, and she reported the incident to several of her other friends, including David McAllister, Loucious Jones, and Brenda Andrews, over the course of the next year.[117]

Seeking to attend to PTSO business and matters related to her child, Williamson attempted to visit the school on several occasions in May 2005 and was removed by Wilson.  On May 9, Ms. Williamson visited the school, and as she was speaking with the school's union representative, Wilson appeared and ordered her to leave.[118]  On May 10, Ms. Williamson and another parent visited Flagg to help with a bake sale; while sitting with a toddler, Ms. Williamson was yet again found by Wilson and asked to leave Flagg.[119]  On May 13, Ms. Williamson was helping Flagg staff for the school's Career Day, when Wilson again asked her to leave.[120]

On June 9, 2005, Ms. Williamson arrived at Flagg for an appointment with her son's teacher and to conduct PTSO business; she signed in as required, but a security guard told her that Wilson wanted her to leave or the police would be called.[121]  "And once again, after many, many, many, many, many, many times of being thrown out of the building and having the cops

---

[115] Williamson Diary, at 410 (entry for Apr. 27, 2005); Jeffries Cert., Ex. DD (set of three municipal court complaints filed by Veronica Williamson, originally attached by Defendant Wilson as Exhibit A to his Counterclaim Complaint) (hereinafter "Williamson Municipal Court Complaints"), at 2 (complaint signed Apr. 27, 2005).

[116] Williamson Decl. ¶ 31.

[117] Williamson Decl. ¶ 32; Andrews Decl. ¶ 9; Jones Decl. ¶ 8; Williamson Dep. 121:5-25; *cf.* Early Decl. ¶ 13 (recalling hearing Ms. Williamson say that Wilson had said something inappropriate to her).

[118] Williamson Decl. ¶ 33; Williamson Diary, at 413 (entry for May 9, 2005).

[119] Jeffries Cert., Ex. EE (May 10, 2005, incident report of Roy T. Wilson); Williamson Decl. ¶ 35; Williamson Diary, at 413 (entry for May 10, 2005).

[120] Williamson Decl. ¶ 35; Williamson Diary, at 413 (entry for May 13, 2005).

[121] Williamson Dep. 58:16-60:18; Williamson Decl. ¶ 36; Williamson Diary, at 417 (entry for June 9, 2005).

being called on [her] so many times, all [Ms. Williamson] could do [was] just leave."[122]

On June 23, 2005, as Ms. Williamson attended a school fashion show, she distributed flyers about PTSO matters, as she had done regularly in the past without advance permission from Wilson.[123]   This time, however, Wilson ordered her to stop distributing the flyers, reporting he did so because the flyers' content was not "evidence-based."[124]   Wilson again called the police on Ms. Williamson.[125]   As Ms. Williamson was leaving the building, Wilson followed directly behind her, forcing her to leave.[126]   According to a witness, Wilson was "yelling at [Ms. Williamson] loudly in a menacing and threatening way, while standing so close to her that if he had been any closer he could have kissed her."[127]

On June 24, 2005, an end-of-year party was held at a restaurant, and Ms. Williamson attended as an invited guest of a retiring teacher to be honored that night.[128]   An attendee describes Ms. Williamson that night as cordial and respectful.[129]   Wilson approached the retiring teacher who invited Ms. Williamson and the restaurant manager, and either (according to three eyewitnesses) demanded that Ms. Williamson be thrown out of the party,[130] or (according to Wilson) simply made the restaurant manager aware of the "potential issue."[131]   Neither the restaurant manager nor the retiring teacher asked Ms. Williamson to leave.[132]   Despite Wilson's claim that he feared for his life because of Williamson's presence, he stayed at the party for at least another hour, had dinner and coffee, showed no fear of Ms. Williamson, and came to Ms.

---

[122] Williamson Dep. 202:5-9.
[123] Andrews Decl. ¶ 3; Williamson Decl. ¶ 37.
[124] Wilson Dep. 246:20-247:1; Williamson Decl. ¶ 37; Williamson Dep. 63:7-13.
[125] Wilson Dep. 248:8-249:5; Williamson Decl. ¶ 37.
[126] Williamson Decl. ¶ 37.
[127] Andrews Decl. ¶ 4.
[128] Wilson Dep. 224:21-225:13; Silveira Dep. 51:23-52:14; Fraser Decl. ¶ 8-9; Williamson Decl. ¶ 38.
[129] Donofrio Decl. ¶ 7.
[130] Donofrio Decl. ¶¶ 6-8; Fraser Decl. ¶ 10; Silveira Dep. 52:15-53:3.
[131] Wilson Dep. 226:5-21.
[132] Fraser Decl. ¶¶ 11-12; Silveira Dep. 53:4-6.

Williamson's table to say hello to another attendee.[133]

Wilson's campaign of retaliatory harassment and removal of Ms. Williamson continued into the fall.  For several days in September 2005, Ms. Williamson and other parents protested Wilson's leadership on the sidewalk outside of the school.  On multiple occasions, at the direct request of Wilson, either Newark police or school security ordered the protesters to move.[134]  When Williamson arrived at the school one day in September, she noticed that her PTSO President's mailbox, in which correspondence and other parent-related documents were placed, had been removed.[135]  Also in September, Ms. Williamson noticed that Wilson had removed the sign-in book from the main office, thereby preventing her from signing in to visit the school.[136]  Sometime that fall, Ms. Williamson again attempted to distribute flyers about matters of interest to parents, but a security guard stopped her and told her that Wilson would not allow it.[137]  Around Thanksgiving, Ms. Williamson and another parent came to the school to deliver turkeys to individuals in need, including victims of Hurricane Katrina; they were approached by a security guard who told them they had to leave, on Wilson's orders.[138]

### F.  Ms. Williamson's Spring 2006 Press Conference About Defendant Wilson's Conduct and Related Municipal Complaint.

Although Ms. Williamson at first feared retaliation against her son at the Flagg school,[139] that fear was eliminated when the District decided to transfer her son away from Flagg in the spring of 2006.  Feeling liberated from the concern that Wilson might further retaliate against her son, she felt compelled to alert the public about the "type of person [who] was running the

---

[133] Fraser Decl. ¶ 13; Donofrio Decl. ¶ 9; Williamson Decl. ¶ 33; Wilson Dep. 226:22-227:2.

[134] Andrews Decl. ¶ 8; Williamson Decl. ¶¶ 39, 41; Williamson Dep. 148:4-15.

[135] Williamson Decl.  ¶ 40.

[136] Williamson Dep. 170:20-171:15; Jeffries Cert., Ex. KK (Sep. 14, 2005, typewritten statement of Veronica Williamson); *see also* Williamson Decl. ¶ 54 (explaining origin of September 14 statement).

[137] Williamson Decl. ¶ 43.

[138] Williamson Dep. 60:24-62:9; Williamson Decl. ¶ 42.

[139] Jones Decl. ¶ 9; Williamson Decl. ¶ 48.

[Flagg] building" so that others would not be harassed and victimized.[140]  To this end, she held a press conference on May 12, 2006, to discuss the variety of ways, sexual and otherwise, that Wilson had harassed and retaliated against her; she spoke with the police in late May, 2006, about his conduct; and she attempted once again to file a municipal complaint.[141]

Confusion at the hearing on Ms. Williamson's municipal complaint caused the judge to dismiss it.  When she appeared in court, the judge asked if what she alleged had occurred on June 11, 2006.  This question was the product of a simple factual error: a police official completing the complaint form mistakenly and inexplicably listed June 11, 2006 as the date on which the harassment was alleged, even though June 11, 2006 was also listed as the filing date for the complaint.[142]  When Ms. Williamson answered the judge truthfully that nothing had happened on that particular date (the harassment she challenged occurred in the spring of 2005), he dismissed the complaint.[143]  After this dismissal, she did not pursue the matter further because she was "exhausted and disappointed with the court system."[144]

Both Superintendent Bolden and Wilson's immediate supervisor, Defendant Silva, agree that Wilson suffered no professional consequences because of Ms. Williamson's sexual-harassment allegations.[145]  Specifically, neither Bolden nor Silva has evaluated Wilson any differently because of Ms. Williamson's claims, and Bolden indicated she would not consider these allegations in making future employment decisions about Wilson.[146]

### G.  Impact Of Defendants' Actions On Ms. Williamson

As a result of Wilson's ongoing harassment, intimidation, and repeated ejections of Ms. Williamson from her son's school, Ms. Williamson has suffered a number of harms.  She has been humiliated, embarrassed, and distressed by the constant harassment and intimidation, which

---

[140] Williamson Dep. 91:9-12; Williamson Decl. ¶ 48.
[141] Williamson Decl. ¶¶ 49-50.
[142] Williamson Municipal Court Complaints, at 3.
[143] Williamson Decl. ¶ 50.
[144] Williamson Dep 144:1-8; Williamson Decl. ¶ 50.
[145] Silva Dep. 120:8-121:14; Bolden Dep. 48:1-15.
[146] Silva Dep. 120:8-16; Bolden Dep. 48:1-15.

even made her fearful for her safety.[147]   Security guards and the police have been called on Ms. Williamson numerous times.  No longer feeling safe inside Flagg, Ms. Williamson asked others to accompany her,[148] and even left crying on several occasions.[149]  She has also been deprived of opportunities to assist her son in his studies to the full extent she could before the ban, having had to decrease sharply her once-regular visits to the school.[150]

Ms. Williamson's speech, advocacy, and efforts to organize and meet with other involved parents have also been suppressed and chilled.  Her March 17, 2005 PTSO meeting was cancelled directly; this cancellation, combined with the continued harassment and ejections of Ms. Williamson that followed, had the effect of constructively cancelling the remaining PTSO meetings scheduled and approved for the remainder of the school year.[151]  As a result, the PTSO began meeting at a local church, where turnout and participation decreased dramatically, from a previous high of over a hundred parents down to thirty one month, and even as low as five another month; the decrease in participation, in turn, greatly diminished the effectiveness of Ms. Williamson's advocacy and of the PTSO.[152]  The March 15 ban from the Flagg building also prevented Ms. Williamson from attending the March 17 SLC meeting.[153]  Finally, the direct suppression of her flyer distribution on June 23, 2005 and in the subsequent fall both prohibited her from speaking directly and diminished the effectiveness of her speech thereafter, with the result that the PTSO's attempts to communicate were "hamstrung."[154]  Given Wilson's ongoing harassment, Ms. Williamson simply refrained from seeking to communicate with parents on Flagg's grounds.  As a consequence, the PTSO's membership and effectiveness was greatly

---

[147] Williamson Decl. ¶ 51.
[148] Early Decl. ¶ 11; Andrews Decl. ¶ 5; Williamson Decl. ¶ 51.
[149] Williamson Dep. 98:25-101:22; Williamson Decl. ¶ 43.
[150] Williamson Decl. ¶¶ 44, 51; Williamson Dep. 52:11-53:53.
[151] Williamson Dep. 151:3-18; Williamson Decl. ¶ 45.
[152] Williamson Dep. 39:1-40:11, 42:17-43:24, 151:9-18; Williamson Decl. ¶¶ 45, 51.
[153] Williamson Dep. 45:22-23; Williamson Diary, at 404 (entry for Mar. 17, 2005); Williamson Decl. ¶ 24.
[154] Williamson Decl. ¶ 46.

diminished.[155]

## PROCEDURAL HISTORY

Ms. Williamson filed her original complaint on August 15, 2005 and an amended complaint on October 31, 2005.  Defendants moved to dismiss the complaint, and on September 28, 2006, the District court partially granted and partially denied their motion, leaving all of Plaintiff's federal and state retaliation, free speech, and assembly claims intact.  Defendants answered the amended complaint on October 9, 2006.  Discovery began in December 2006.

Defendants subsequently moved to amend their answer to add counterclaims by Wilson, and on April 11, 2007, this court partially granted and partially denied the motion, leaving intact counterclaims for defamation and malicious prosecution.   Discovery concluded on October 19, 2007.  Plaintiff now files this motion for partial summary judgment on her retaliation, free speech, and assembly claims, and for summary judgment on Wilson's counterclaims.

## ARGUMENT

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) .

For the reasons stated below, Ms. Williamson is entitled to summary judgment against Defendants Wilson, Bolden, and NPS on her retaliation claim; Wilson and NPS on her free-speech claim concerning the limitations on her distribution of flyers and other materials; and Wilson, Silva, and NPS on her free-speech and assembly claims concerning the cancellation of her organization's meetings.  Ms. Williamson is also entitled to a judgment that she is not liable for either of Wilson's counterclaims.

---

[155] Williamson Decl. ¶¶ 37, 43, 46.

23

I.     **AS A MATTER OF LAW, PLAINTIFF HAS ESTABLISHED A FIRST AMENDMENT RETALIATION CLAIM AGAINST WILSON, BOLDEN, AND NPS FOR BANNING HER FROM THE FLAGG SCHOOL.**

The undisputed facts show that Ms. Williamson is entitled to judgment as a matter of law on her First Amendment retaliation claims. Specifically, the undisputed facts reveal the following:

- Wilson violated Ms. Williamson's First Amendment rights by retaliating against her for her speech criticizing his job performance;

- Bolden knew of and acquiesced in Wilson's conduct and is therefore liable in a supervisory capacity; and

- NPS is liable as a municipality because, via its final policymaker Bolden, the District officially adopted Wilson's unconstitutional action.[156]

**A.  Wilson Violated Ms. Williamson's First Amendment Right To Be Free From Retaliation For Her Speech Because She Engaged In Protected Speech, Wilson Responded With Retaliation, and Ms. Williamson's Protected Speech Caused The Retaliation.**

To establish a First Amendment retaliation claim, a plaintiff must show that 1) she engaged in protected speech; 2) the government responded with retaliation; and 3) the protected speech was the cause of the retaliation. *Estate of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir. 2002); *Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir. 1997). Here, Ms. Williamson's speech criticizing Wilson's  performance as school principal is protected by the First Amendment; Wilson retaliated against Ms. Williamson by banning her from the school and otherwise harassing her; and the protected speech caused the subsequent retaliation.

1.  Ms. Williamson's speech criticizing the performance of Wilson is protected by the First Amendment.

The First Amendment protects a wide spectrum of speech, and the right of citizens to criticize government officials lies at its irreducible core. *Burson v. Freeman*, 504 U.S. 191, 196

---

[156] Williamson alleges First Amendment claims under both the federal and state constitutions. New Jersey free speech claims are analyzed under the same framework as their federal counterparts. *See Karins v. City of Atlantic City*, 152 N.J. 532, 547 (1998). Thus, Williamson's federal-claims discussion also establishes her entitlement to summary judgment on her state claims.

(1992) ("[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs." (citation omitted)).  The Supreme Court has long held that the First Amendment protects debate on public issues that "may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."  *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).  The controversial or even offensive nature of a statement affords it no less free-speech protection. *Rankin v. McPherson*, 483 U.S. 378, 387 (1987) (statement that speaker hoped someone would "get" the President was protected under the First Amendment); *see also Watts v. United States*, 394 U.S. 705, 706-08 (1969) (noting that criticism of government officials is often "vituperative, abusive, and inexact," and holding that a reference to getting the President in a rifle's "sights" was protected political speech).  Wilson, as an elementary-school principal, is a government official charged with the vital public responsibility of educating children.  As such, speech critical of his conduct is precisely the kind of speech protected by the First Amendment.

Ms. Williamson's March 15 statement that Wilson would soon be "leaving" the school because he "d[oes]n't do [his] job" was the culmination of months of increasing political antagonism between Wilson and Ms. Williamson.  In late 2004 and early 2005, Ms. Williamson had raised increasing concerns about the school's environmental health, among other matters.  By early 2005, Wilson told Ms. Williamson that her inquiries about the school's air and water quality were not her "business," and that he disagreed with her as to the substance of her concerns about the school's environmental health.  In late February 2005, despite a NPS policy prohibiting District personnel from interfering with the internal operations of parent organizations, Wilson publicly announced his opposition to Ms. Williamson's re-election candidacy.  A week later, Wilson told Ms. Williamson that she could no longer visit her son's classrooms, even though her son's teachers had requested that she do so.  Immediately after Wilson's decision to preclude Ms. Williamson from visiting her son's classes, Ms. Williamson expressed her concerns about Wilson's leadership, both as it related to her own son and also more broadly, to his superiors.  The next interaction after Ms. Williamson's March 11

conversation with Assistant Superintendent Silva, Wilson's direct supervisor, was the March 15 incident at which Wilson banned Williamson.  It is in this context — of increasing ideological disagreement between Wilson and Ms. Williamson about his leadership of the school and of the environmental safety of the building — that Ms. Williamson asserted that Wilson should be fired because of his poor performance.  *See* Facts Section D, *supra*.

Ms. Williamson's statement that Wilson should be terminated given his poor job performance is virtually the prototype for the kind of speech protected by the First Amendment. *Burson*, 504 U.S. at 196; *New York Times*, 376 U.S. at 270.  Wilson is a government official with vital public responsibilities concerning the nurturing and education of children.  Williamson was not only the mother of a child under Wilson's care, she was the elected president of an organization charged with advocating for the interests of all parents whose children were also under Wilson's care.  As such, Williamson's statements about Wilson's performance lie at the heart of the First Amendment's purpose and are therefore protected under that Amendment. Indeed, the Amendment protects speech far more threatening than Ms. Williamson's merely ideological contention that Wilson's poor job performance merits his firing.  *See, e.g., Watts*, 394 U.S. at 706 (threat to aim a rifle at the President if given a chance is protected by the Amendment); *Rankin*, 483 U.S. at 381(statement hoping someone will "get" the President is protected).

Wilson asserted in his deposition — for the first time — that he banned Ms. Williamson because he feared "[d]eath or bodily harm" from her when she stated that "you'll be leaving before he [her son] does because you don't do your job."[157]  But no reasonable juror could believe this unfounded claim.  Specifically, Wilson absurdly contends that Ms. Williamson's statement that he would be "leaving" Flagg amounted to a death threat because, in Wilson's words, "if I'm not going to be here next year, then I'm not going to be here next year."[158]  This

---

[157] Wilson Dep. 163:16-164:14.
[158] Wilson Dep. 160:4-5.

tautological explanation is so implausible that no reasonable jury could find it to be anything more than a post-hoc excuse for Wilson's unjustified and unlawful conduct.

First, Ms. Williamson's statement — "you'll be leaving before he [*i.e.*, Ms. Williamson's son] does" — signals that both her son and Wilson will eventually be "leaving" Flagg.  If stating that someone will be "leaving" the school amounts to a death threat, then Wilson would also have had to believe that Ms. Williamson had just threatened her own son.  Just as no reasonable person would believe that Ms. Williamson was threatening her son by implying that he would be "leaving" the school — obviously she was referring to Wilson's immediately preceding statement that her son would be leaving the building if he did not appear for detention — no reasonable person could construe Ms. Williamson's statements about Wilson's job performance to mean that she intended to cause Wilson not only to leave the school as principal, but also to leave this life.

Second, though Defendant now claims Ms. Williamson's statement caused him to fear "death or bodily harm" — and claims even that the March 2005 statement caused him still to fear death or bodily harm from Ms. Williamson at the time of the deposition — he failed to mention any fear, much less a fear of death, in his contemporaneous memorandum describing the March 15 incident.  Neither was this alleged fear reported by Vice-Principal Silveira, the only other witness to the speech, who characterized Ms. Williamson's statement merely as an "inappropriate" evaluation of Wilson's job performance in light of her lack of supervisory "authority" over him.  And nor does Superintendent Bolden recall Wilson ever mentioning Ms. Williamson's purported death threat.  *See* Facts Section E.1, *supra*.

Third, Wilson's behavior toward Ms. Williamson following her March 15 statement further belies his claim that he feared for his life.  Despite this supposed fear, Wilson does not recall ever seeking a restraining order against Ms. Williamson and, in any event, Ms. Williamson was never served with one.  And despite Wilson's claim that he felt safe in her presence on subsequent occasions — including his deposition in this very case — only because of the presence of others, Wilson nonetheless affirmatively approached Ms. Williamson, alone, in the

school building in April 2005[159] and, in June 2005, sought out another opportunity to be alone with her by instructing his staff that if Ms. Williamson arrives, "she is to meet with me only."[160] Moreover, despite Wilson's purported fear that Ms. Williamson would harm him, he nonetheless stayed at the June 24 end-of-the-year party through dinner and coffee – even though he was unsuccessful in his attempts to have Ms. Williamson kicked out – and he even came to the table where she was sitting to greet someone else at the party.[161]  Wilson also claims to have felt safe on a separate occasion simply because Plaintiff had signed the Settlement Agreement with the District regarding her reentry into the school.  *See* Facts Section E.1, *supra*.

Even where a material fact is disputed, summary judgment is appropriate if the dispute is so lopsided that, based on the evidence, no reasonable jury could find for the nonmoving party. *See El v. S.E. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).  Two and a half years after the March 15, 2005 ban, Wilson now claims that he feared death or bodily harm based on Williamson's statement that he would be leaving the school because he was doing a poor job. This contention is not only absurd on its face — Williamson's statement makes no reference whatsoever to the use of force and was merely a retort to Wilson's statement that her son would be leaving the school — but it is also wildly inconsistent both with Wilson's contemporaneous documentation of his interactions  with Ms. Williamson (including his write up of the March 15 incident itself) and his subsequent actions of continually seeking out a person of whom he was purportedly deathly afraid.  Because no reasonably jury could credit Wilson's claim that the ban was motivated by a fear of death or bodily injury, *id.* at 238 n.7, Ms. Williamson must prevail on this issue as a matter of law.

Because Ms. Williamson's speech to Wilson was simply a criticism of his performance as public-school principal, it is part of the core of what the First Amendment protects: "free discussion of governmental affairs." Her speech is thus protected by the First Amendment.

---

[159] Wilson Dep. 236:7-237:1.
[160] Wilson June 10 Memo.; Wilson Dep. 222:22-223:5 (confirming the account in his memo).
[161] Fraser Decl. ¶ 13; Donofrio Decl. ¶ 9; Wilson Dep. 226:22-227:2.

**2.  Wilson responded to Williamson's protected speech by banning her from
Flagg and by repeatedly harassing her in the following months.**

The second prong of the First Amendment retaliation test considers whether the plaintiff
was denied a benefit after exercising her First Amendment rights.  *Anderson*, 125 F.3d at 163.
By formally banning her from the school, and then effectively maintaining that ban through a
continued pattern of retaliatory removals and intimidation even after the ban was formally lifted
by NPS, Wilson denied Ms. Williamson a number of significant benefits after she criticized his
job performance on March 15.

After March 15, 2005, Ms. Williamson was effectively banned from the Flagg school,
and thus prevented from enjoying a benefit that other parents and citizens enjoyed under the
District's open-door visitation and use-of-facilities policies.[162]  As discussed above, in addition
to the month-long formal ban from mid-March until mid-April, Wilson repeatedly either kicked
Ms. Williamson out of the building, often calling security or the Newark police department to do
so, or harassed her in other ways that effectively forced her from the building.  Indeed, after the
expiration of the formal ban, Wilson forced Ms. Willamson from the school on no fewer than
eight occasions in the last two months of the 2004-05 school year — not including Wilson's
attempt to remove Ms. Williamson from an end-of-the-year party that was not even held on
school grounds, at which she was an invited guest.  By late fall of 2005, after another series of
removals by Wilson, Ms. Williamson largely abandoned the fruitless quest of attempting to visit
the school given Wilson's ongoing retaliation.

Wilson's ban, both in its formal and informal dimensions, interfered first with Ms.
Williamson's ability to support her son's academic development.  Teachers had often asked Ms.
Williamson to observe her son's classes given that that kind of parental involvement enhanced a

---

[162] *See supra* at I.A (discussing NPS's policies "welcom[ing]" parent visits and encouraging
parents to develop a sense of ownership concerning access to and use of school facilities).

parent's ability to assist her child with his school work.[163]  Ms. Williamson's ability to provide academic support to her son was compromised by the ban.

In addition, the ban and associated harassment emasculated Ms. Williamson's advocacy as parent leader, effectively ending her role as PTSO President.  By the spring of 2005, the PTSO under Williamson regularly attracted over 75 parents to its meetings, and had become an active force in ensuring that the needs of children and parents effectively communicated to the Flagg administration.  When Wilson was finished with his campaign of retaliatory conduct, Ms. Williamson could barely schedule meetings or even communicate with the PTSO's members, let alone convene meetings on school grounds.  The ban limited Ms. Williamson's access to the school and her ability to conduct PTSO meetings on school grounds; and Wilson's retaliatory limitations on flyer distribution undermined Ms. Williamson's ability to communicate and assembly with other parents on PTSO-related matters.  The result: the PTSO withered from an organization with scores of members to one with merely a handful.  Wilson's retaliation also impaired Ms. Williamson's participation as a member of the SLC, an oversight board promulgated under New Jersey law to set instructional priorities for urban schools.  *See* N.J. Admin. Code § 6A:10A-5.3.  In short, Wilson's retaliation silenced Ms. Williamson and the PTSO, rendering inert what were once powerful voices for the interests of Flagg's children and parents.  *See* Facts Section G, *supra*.

Accordingly, Wilson's conduct deprived Ms. Williamson of the ability to visit the school on the same basis as other parents, and even non-parent visitors.  Wilson's conduct, moreover, obstructed Ms. Williamson's ability to communicate and meet with other parents and, in so doing, led to the demise of Ms. Williamson and the PTSO as meaningful vehicles for the vindication of parent interests.  In these ways, the benefits denied Ms. Williamson in retaliation for her protected speech lie at the core of the benefits protected by the First Amendment.

---

[163] Williamson Decl. ¶ 16.

### 3.  Wilson has admitted a causal link between Ms. Williamson's speech and his decision to ban her from the Flagg school.

The final element of a First Amendment retaliation claim considers whether the defendant's conduct was motivated by the plaintiff's protected speech.  *Anderson*, 125 F.3d at 163.  Causation may be proved directly, or inferred, either from the timing of retaliatory actions, *see Estate of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir. 2003), or from a pattern of "ongoing antagonism," *see Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000).

In this case, causation concerning the original ban has been indisputably proven: Wilson's own account of his March 15, 2005 decision to ban Ms. Williamson from the school explicitly identifies her speech as the cause.  Wilson's contemporaneous memo reports that "*because* of her comments towards [him], she would not be permitted back in the building."[164] Vice-Principal Silveira's contemporaneous account of the incident is in accord.[165]  Wilson's admission about causation could not be more clear or direct.  Ms. Williamson has thus established as a matter of law that her exercise of free speech criticizing Defendant Wilson's performance as a public official caused him to ban her from the school.

Wilson's continuing exclusions and harassment of Ms. Williamson after the initial ban was triggered by Wilson's distaste for Ms. Williamson's protected speech.  From March 15 on, Williamson was unable to visit the Flagg school without being harassed or removed from the school by Wilson.  This series of events — stopping during the summer only because school was out of session — constituted "ongoing antagonism" by Wilson, and accordingly reveals causation concerning the harassment and ejections from the building following the lifting of the formal ban.  *See Farrell*, 206 F.3d at 280-81 (recognizing that causation may be inferred from pattern of "ongoing antagonism"); *see also Robinson v. S.E. Pa. Transp. Auth.*, 982 F.2d 892,

---

[164] Wilson Ban Memo., at 4 (emphasis added); *see also* Wilson Dep. 161:11-19, 163:16-164:2.
[165] Silveira Ban Memo., at 6 (reporting that Wilson told Ms. Williamson that "because of her comments . . . she will not be permitted back inside the building"); Silveira Dep. 40:17-41:25 (attesting to the accuracy of his account and noting that it was written the day of the incident).

894-96 (3d Cir. 1993) (same).[166]  Yet, the only thing that had changed since Ms. Williamson was afforded unfettered access to the Flagg school is that she had disagreed with and criticized Wilson, and shared her criticism with his superiors.  The only material fact that had changed as between Ms. Williamson's visits before March 2005 was her substantive disagreement with Wilson about his performance, disagreements she expressed to his superiors.

Accordingly, Ms. Williamson has established as a matter of law that she engaged in protected speech in criticizing Wilson's job performance; that Wilson engaged in retaliatory conduct by banning and continually harassing her, thereby impairing her ability to participate in her son's education and to perform her duties as PTSO president, SLC member, and parent leader; and that her protected speech criticizing Wilson's performance as a public official caused the retaliatory conduct.  Williamson is thus entitled to summary judgment on her First Amendment retaliation claim against Wilson.  *Anderson*, 125 F.3d at 161.

### B.  Bolden Is Liable for First Amendment Retaliation Because She Affirmed Wilson's Unconstitutional Decision To Ban Ms. Williamson.

A supervisor is personally liable for the constitutional torts of subordinates if she "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in [the] subordinates' violations."  *A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004); *see also Baker v. Monroe Tp.*, 50 F.3d 1186, 1190-91 (3d Cir. 1995).  Here, Bolden affirmed Wilson's unconstitutional ban.[167]  In so doing, she both participated in violating Williamson's rights, and knew of and acquiesced in the violation.  First, Bolden directly participated by affirming the ban, which sustained the ban formally for another month (after which, as noted above, it continued informally, but no less effectively).  Second, and alternatively, Bolden's affirmance constitutes knowledge of and acquiescence in the constitutional violation: she obviously could not make the

---

[166] Wilson's treatment of Ms. Williamson is merely illustrative of his practice of retaliating and harassing those who express perspectives challenging his authority.  *See* Facts Section B, *supra*.
[167] Bolden Dep. 18:8-20; Silva Dep. 71:9-25.

affirmative decision to formalize the ban without knowing about it, and if "acquiescence" can be shown where a supervisor is "aware of the problems . . . but did nothing to stop them," *Andrews v. City of Phila.*, 895 F.2d 1469, 1479 (3d Cir. 1990), then affirmatively approving and perpetuating the ban qualifies as "acquiescing" to it.  Bolden, too, is thus liable for the unconstitutional ban under either of two theories of supervisory liability.

### C.  NPS is Liable Because Its Final Policymaker Ratified Wilson's Unconstitutional Decision To Ban Ms. Williamson From The Flagg School.

Although *respondeat superior* is not a basis for liability under § 1983, a municipality (including a school district) is liable when its policy or custom precipitated a violation of federal law, even when that policy consists of a single decision by a final policymaker or a final policymaker's ratification of a subordinate's unconstitutional decision.  *See, e.g.*, *McGreevy v. Stroup*, 413 F.3d 359, 367-68 (3d Cir. 2005) (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480 (1986) and *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)); *see also Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir. 2006).  Here, the District is liable for the unconstitutional ban because Bolden, the District's final policymaker, ratified Wilson's unconstitutional decision.

The identity of final policymakers whose actions are binding for municipal liability purposes is a question of state law.  *McMillian v. Monroe County*, 520 U.S. 781, 786 (1997); *McGreevy*, 413 F.3d at 368.  NPS is a state-operated school district, created in 1995 under a state-law mechanism permitting state takeover of a local district.  *See Gonzalez v. State Operated Sch. Dist. of City of Newark*, 345 N.J. Super. 175, 178 (App. Div. 2001).  State law provides that such a district "may be conducted by and under the supervision of a State District superintendent of schools."  N.J. Stat. § 18A:7A-35(a).  In fact, in NPS's case, the District is supervised by a State District superintendent, and that person is Bolden.[168]  Accordingly, under New Jersey law, Bolden is the final policymaker for NPS.

---

[168] Bolden Dep. 6:22-7:2.

A municipal entity is liable if an official with authority ratifies a subordinate's unconstitutional actions. *McGreevy*, 413 F.3d at 367; *see also Hill*, 455 F.3d at 245 (3d Cir. 2006). NPS is liable for Wilson's unconstitutional actions because Bolden, NPS's final policymaker, ratified his decision. Bolden admitted that she made the final decision approving Wilson's ban; in fact, Bolden attributed the ultimate ban decision explicitly to "the District."[169] Because Superintendent Bolden, the District's final policymaker, ratified and assumed responsibility for Defendant Wilson's decision, NPS is liable for its unconstitutionality.[170]

## II.    MS. WILLIAMSON HAS ESTABLISHED AS A MATTER OF LAW THAT DEFENDANT WILSON UNCONSTITUTIONALLY PROHIBITED HER FROM DISTRIBUTING FLYERS AND THAT BOTH WILSON AND NPS ARE LIABLE FOR THIS UNCONSTITUTIONAL, VIEWPOINT-BASED PRIOR RESTRAINT OF SPEECH.

It is undisputed that Ms. Williamson was distributing flyers at the Flagg school on June 23, 2005, and that Wilson ordered her to stop.[171] This action was unconstitutional for three distinct reasons:

- First, the prohibition was a viewpoint-based restriction of speech executed under a viewpoint-discriminatory policy;

- Second, the prohibition was undertaken pursuant to a District policy unconstitutionally granting principals unfettered discretion over what printed materials are distributed in their schools; and

---

[169] Bolden Dep. 18:8-11 (Q: "[W]ho made the final decision to ban Ms. Williamson from the Flagg School?  A:  "I guess the District did with advice from counsel.").

[170] In contrast to the standard outlined in the recent cases of *McGreevy* and *Hill*, older Circuit authority holds that municipal liability attaches where the final policymaker approves both the subordinate's unconstitutional decision and the basis for it. *See Andrews v. City of Phila.*, 895 F.2d 1469, 1481 (3d Cir. 1990). This standard, too, is met in this case:  the reasons for the ban were expressed in a letter to Ms. Williamson from the District's lawyer, Perry Lattiboudere, and the Lattiboudere letter embraces Wilson's unconstitutional rationale for banning Ms. Williamson — her protected speech that Wilson implausibly claims to have found "threatening."  *See* Jeffries Cert., Ex. JJ (Mar. 18, 2005, letter of P. Lattiboudere to V. Williamson) (accusing Ms. Williamson of "threatening . . . conduct").

[171] Andrews Decl. ¶ 3; Williamson Decl. ¶ 37; Williamson Dep. 63:7-13; Wilson Dep. 246:13-247:1.

- ▪ Third, the prohibition was unreasonable in light of the purpose of the First Amendment forum the District had established at the Flagg school.

Any one of these reasons is sufficient to establish as a matter of law that Wilson violated Ms. Williamson's First Amendment rights.  Her speech was not only suppressed on the particular occasions when she could not distribute flyers, which included another instance in which she was prevented from distributing flyers in the fall of 2005,[172] but it also chilled her expression more broadly, as she purposefully avoided otherwise-constitutional communications in fear of continued suppression.  *See* Facts Section G, *supra*.

As for NPS, it is liable for Wilson's violation of Ms. Williamson's rights because it delegated final policymaking authority to him concerning the distribution of printed materials at Flagg; to this extent, Wilson's actions in this area, as a matter of law, are the actions of the District.  In addition, NPS is also liable for the suppression of Ms. Williamson's speech because it was executed under an official District policy.

**A.  Wilson's Prohibition Of Ms. Williamson's Distribution Of Flyers Violated Her Free Speech Rights Because It Was Viewpoint-Based, Undertaken Pursuant To An Unconstitutional District Policy, And Unreasonable In Light Of The Nature Of The Forum.**

  1. Wilson prohibited Plaintiff from distributing flyers solely to suppress her point of view because he did not consider it "evidence-based."

The government's authority to regulate speech on its own property depends on the type of First Amendment forum involved.  *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985).  Regardless of the nature of the forum, however, one cardinal rule governs all government regulation of speech: the government may not suppress speech on the basis of a speaker's viewpoint.  *E.g., Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 392-94 (1993) (holding that a viewpoint-based denial of access to school premises to engage in expressive activity was unconstitutional, regardless of the type of forum the school had

---

[172] Williamson Decl. ¶ 43.

created); *Cornelius*, 473 U.S. at 806.  Wilson's decision to prohibit the distribution of flyers by Ms. Williamson violated this basic tenet of First Amendment law.

Under NPS's policy on literature distribution, Policy 1140 — which Wilson and Bolden assert applies to parents even though the policy itself does not say so[173] — the Superintendent or her designee must approve the flyers before distribution.[174]  Wilson is the Superintendent's designee for purposes of this policy.[175]

Wilson also applies his own school-specific policies regarding what may be distributed at Flagg.  Wilson prohibits distribution of material if it is "of a graphic nature, if the content is inappropriate, [or] if the content is not evidence based."[176]  Wilson testified that his "evidence-based" criterion requires the speaker's information not only to be empirically substantiated, but also that the substantiating evidence derive from the District itself.[177]  Under Wilson's policy, for example, he would not permit the distribution of materials containing claims about potential lead in the school's water or poor air quality, he testified, because such statements are not supported by District-authenticated sources.[178]

On June 23, 2005, Ms. Williamson was circulating flyers at the Flagg fashion show when Wilson ordered her to stop.[179]  His said that his reason for doing so was that the information "wasn't evidence based and it wasn't factual."[180]  While there is a dispute as to the content of the flyers,[181] this dispute is immaterial because Defendant Wilson — applying his "evidence based" criterion — testified that he prohibited Ms. Williamson from circulating the flyers because he thought the flyers "contained some inaccurate information" regarding the school's air and water

---

[173] Wilson Dep. 97:14-98:19; Bolden Dep. 15:19-21.

[174] Jeffries Cert., Ex. H (NPS Policy 1140, "Distribution of Materials by Pupils and Staff") (hereinafter "Policy 1140").

[175] Bolden Dep. 14:8-11; Wilson Dep. 95:2-20.

[176] Wilson Dep. 91:16-18.

[177] Wilson Dep. 94:18-23.

[178] Wilson Dep. 92:20-93:12, 94:18-23.

[179] Wilson Dep. 246:13-18; Williamson Dep. 63:7-13.

[180] Wilson Dep. 246:20-247:1.

[181] *Compare* Williamson Dep. 63:7-13 ("fliers for the PTSO meeting for that week or that night"), *with* Wilson Dep. 246:19-21 (flyers "[r]elated to lead in the water and poor air quality").

quality.[182]  Wilson's suppression of Ms. Williamson's speech represents an impermissible, viewpoint-based application of an impermissible, viewpoint-based policy.

First, this evidence-based criterion is facially unconstitutional because it suggests that government may suppress speech on the basis of a unilateral determination as to the substantive merits of particular viewpoints —a standard that is plainly unconstitutional under the First Amendment.  Second, as applied to Ms. Williamson, the policy reveals itself to be irrevocably viewpoint-based.  Wilson prohibited Ms. Williamson from distributing her information simply because he disagreed with the viewpoint espoused in the flyers.  Wilson's entire "evidence based" policy is thus fundamentally viewpoint-based — any viewpoint that Wilson personally believes to be insufficiently supported by District-approved evidence is subject to suppression. Under this policy, for example, Wilson would deny permission to distribute flyers saying, "Principal Wilson is doing a bad job," unless the speaker came forward with evidence, from NPS itself, to support this claim.  The First Amendment does not permit a government official to disallow speech simply because the official does not agree with the viewpoint of the message or thinks it false.  *Lamb's Chapel*, 508 U.S. at 394 ("[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974) ("Under the First Amendment there is no such thing as a false idea.").  Wilson prohibited Ms. Williamson from passing out the flyers "solely to suppress the point of view [s]he espouse[d]," *Cornelius*, 473 U.S. at 806, and thereby violated her First Amendment rights.

Wilson's actions in not only preventing Ms. Williamson from distributing flyers but also in repeatedly forcing her from the building, had a chilling effect on her speech thereafter.  Prior to this incident, Williamson had regularly distributed PTSO flyers or left them for distribution to students.[183]  After this humiliating incident, and in conjunction with Wilson's above-described

---

[182] Wilson Dep. 246:13-18.
[183] Williamson Decl. ¶ 37.

retaliatory actions, Williamson no longer felt comfortable passing out flyers at Flagg, and thus her constitutionally protected speech was curbed not just for an evening, but for far longer.[184]

### 2. The NPS policy regarding distribution of flyers is unconstitutional on its face because Wilson possesses unfettered discretion to approve material for distribution.

Any system of prior restraint, in which expressive material may be suppressed by government before dissemination, is presumptively unconstitutional. *Freedman v. Maryland*, 380 U.S. 51, 57 (1965); *see also Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992). Laws requiring government permits for expressive activity before the fact must contain procedural safeguards, including limitations on the discretion of licensing officials. *See, e.g., Forsyth County*, 505 U.S. at 130; *Freedman*, 380 U.S. at 58.

On the other hand, prior-review policies granting government "unbridled decisionmaking" are unconstitutional because the decisionmaker may discriminate against the speaker based on viewpoint or speech content. *E.g.*, *Forsyth County*, 505 U.S. at 130; *see also Peachlum v. City of York*, 333 F.3d 429, 439 (3d Cir. 2003) (noting that the necessity of "narrow, objective, and definite standards" derives from the "danger of censorship and of abridgment of our precious First Amendment freedoms"). Federal courts have therefore repeatedly held that unfettered discretion in the regulation of speech is constitutionally problematic regardless of the type of forum at issue. *Child Evangelism Fellowship of S.C. ("CEF-SC") v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1068 (4th Cir. 2006) (prohibition on unbridled discretion is "a constant in forum analysis"); *Atlanta Journal & Const. v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298, 1306-07, 1310-11 (11th Cir. 2003) (designated forum); *DeBoer v. Village of Oak Park*, 267 F.3d 558, 566-67, 572-74 (7th Cir. 2001) (nonpublic or limited public forum); *Lewis v. Wilson*, 253 F.3d 1077, 1079-80 (8th Cir. 2001) (policy facially unconstitutional without regard to forum);

---

[184] After this incident, Ms. Williamson attempted to pass out flyers at Flagg once again, this time outside of the school, during the fall of 2005; as she was doing so, a security guard told her to stop, because Wilson said she could not pass them out. Williamson Decl. ¶ 43.

*Summum v. Callaghan*, 130 F.3d 906, 919, 920 (10th Cir. 1997) (directing the district court to examine the policy's discretion without regard to forum).

It is thus unsurprising that lower courts throughout the country, in an unbroken line of decisions stretching back over thirty years, have prohibited prior-restraint schemes in the school context that vest unfettered discretion in administrators or lack the kind of procedural safeguards set forth in *Freedman*.  *See, e.g.*, *Child Evangelism Fellowship of Md., Inc. v. Montgomery County Pub. Schs.*, 457 F.3d 376, 386-389 (4th Cir. 2006); *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 280-82 (5th Cir. 2003) (allowing challenge by parents to the school policy); *Nitzberg v. Parks*, 525 F.2d 378, 383-88 (4th Cir. 1975) (retired Justice Clark, for the panel); *Eisner v. Stamford Bd. of Educ.*, 440 F.3d 803, 810-11 (2d Cir. 1971); *Riseman v. Sch. Comm. of City of Quincy*, 439 F.2d 148, 149-150 (1st Cir. 1971); *see also M.B. ex rel. Martin v. Liverpool Cent. Sch. Dist.*, 487 F. Supp. 2d 117, 142-46 (N.D.N.Y. 2007); *Rivera v. E. Otero Sch. Dist. R-1*, 721 F. Supp. 1189, 1197-98 (D. Colo. 1989).  Thus, for example, courts have held unconstitutional school prior-approval policies that lack clear standards concerning permissible and impermissible materials.  *See, e.g., Shanley v. N.E. Indep. Sch. Dist.*, 462 F.2d 960, 975-77 (5th Cir. 1972) (holding facially unconstitutional school speech policy containing "no standards whatsoever"); *CEF-SC*, 470 F.3d at 1069-70 (rejecting "best interest of the district" standard as too subjective); *Westfield High Sch. L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98, 103, 126-27 (D. Mass. 2003) (concluding that policy permitting only "reasonable speech," and not permitting non-curriculum-related materials without defining that term, impermissibly vests administrators with unbridled discretion).  Accordingly, prior-approval policies are permissible only when they set forth specific standards to guide administrative discretion, a short time frame in which decisions to approve or deny materials must be made, and an appeal process.  *See, e.g.*, *Bystrom v. Fridley High Sch.*, 822 F.2d 747, 755-57 (8th Cir. 1987) (upholding policy prohibiting specific categories of material where the school policy, which consisted of several pages, included several paragraphs of detailed definitions of key terms).

Here, NPS Policy 1140 provides that:

> Material being sent home with students should relate to school
> matters or pupil-related community activities.  Except when it
> pertains to the individual pupil, all such material must be approved
> in advance by the State District Superintendent/designee."[185]

The policy prohibits the use of pupils to distribute "partisan materials" or "partisan information pertaining to a school or general election, budget or bond issue, or negotiations," and the policy also declares that pupils "shall not be exploited for the benefit of any individual, group, or profit-making organizations."[186]  The policy contains no other language defining permissible materials.

This policy is facially unconstitutional because it provides effectively boundless discretion to the Superintendent or her designee in deciding which materials may be distributed. Though the policy indicates that certain types of materials should be rejected — specifically materials that do not "relate to school matters or pupil-related community activities," "partisan" materials or information, or materials that somehow "exploit[]" pupils "for the benefit of an individual, group, or profit-making organization" — none of the relevant terms is anywhere defined, and their meaning is far from clear on their face.  *Cf. Westfield High Sch. L.I.F.E. Club*, 249 F. Supp. 2d at 103, 126-27 (finding undbridled discretion where key terms are undefined). Worse still, the policy does not indicate that the short list of impermissible materials is exhaustive, nor are there criteria specifying when materials should be approved.  *Cf. Shanley*, 462 F.2d at 975-977 (striking down policy that lacked any standards).  The policy thus permits the Superintendent or her designee to reject any material he or she wishes.  The policy thus lacks those safeguards required to prevent the "danger of censorship and [the] abridgment of our precious First Amendment freedoms."  *Peachlum*, 333 F.3d at 439 (citation omitted).

The potential for abuse inherent in this policy is apparent from Wilson's admissions about how he determines whether to approve the distribution of material.  Wilson denies distribution if the materials are "of a graphic nature, if the content is inappropriate, [or] if the

---

[185] Policy 1140 (Jeffries Cert., Exh. H).
[186] Policy 1140.

content is not evidence based."[187]  It is precisely the vagueness of Policy 1140 that enables Wilson to implement his own personal opinions about permissible materials, including his viewpoint-based policy that all materials distributed must be substantiated to Wilson's satisfaction.  The danger of unfettered discretion leading to viewpoint-discrimination has been repeatedly recognized by the Supreme Court and the Third Circuit.  *See, e.g.*, *Forsyth County*, 505 U.S. at 130; *Peachlum*, 333 F.3d at 439.  In this case, this danger came to pass: Wilson interpreted and applied the standardless Policy 1140 to silence those voices with which he did not agree.  And, as such, this case is a textbook example of why unfettered discretion is inherently constitutionally problematic.

Because Policy 1140 grants Wilson unfettered discretion to exercise the power of prior restraint of speech, it is facially unconstitutional and its application to Ms. Williamson breached her First Amendment rights.

### 3.  Wilson's suppression of Ms. Williamson's flyers was unconstitutional because it was unreasonable in light of the nature of the forum.

The government's ability to limit speech on public property turns on the nature of the forum.  *Gregoire v. Centennial Sch. Dist.*, 907 F.2d 1366, 1371 (3d Cir. 1990).  In a limited public forum, a forum the government creates when it restricts the type of speech allowed based on the types of permitted speakers and subject matters, restrictions on speakers or content are permissible as long as they are viewpoint-neutral and "reasonable in light of the nature of the forum."  *Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211, 225 (3d Cir. 2003).

Defendants have already asserted that the Flagg school is a limited public forum.[188]  Accepting this contention for the sake of argument, Defendants created that forum by establishing a policy for distributing literature on school grounds,[189] and a practice of allowing

---

[187] Wilson Dep. 91:16-18.

[188] Defs. Br. Supp'g Mot. to Dismiss, Oct. 5, 2005, at 14-15.  While Plaintiffs do not concede that Flagg is a limited public forum at this time, even under the limited public forum analysis, Defendants have violated the First Amendment by restricting Plaintiff's speech in an unreasonable manner in light of the nature of the forum.

[189] Policy 1140.

parents and outside groups school access to distribute literature under that policy.[190]  Policy

1140, which applies to parents and visitors,[191] permits the dissemination of materials that "relate

to school matters or pupil-related community activities."[192]

       Although by its terms the policy requires prior approval for the distribution of any

material, *see supra* Part II.A.2, Wilson's testimony informs that he did not consistently enforce

this pre-approval requirement.  On several occasions, the PTSO distributed flyers in the 2004-05

school year without his permission,[193] and after learning of the authorized distributions, he chose

not to stop them because the failure to obtain prior approval was an "oversight" and the literature

was consistent with the nature of the District policy.[194]  He also allowed the parent liaison at

Flagg to pass out flyers without previously obtaining his permission.[195]  Because Wilson had not

consistently enforced the approval portion of the written policy, the record shows that

Defendants have created a forum where approval is not necessary when flyers are consistent with

Policy 1140's purposes.  *See Gregoire*, 907 F.2d at 1371 (noting that nature of forum turns on

government practices with respect to the forum).

       Williamson attempted to distribute flyers that were consistent with the nature of the

forum because they "relate[d] to school matters or pupil-related community activities."[196]  As

noted, the content of the flyers is disputed by the parties, *see supra* Part II.A.1; however, this

dispute is again immaterial.  Whether the flyers pertained to a PTSO meeting (as Ms. Williamson

claims[197]), or to the air or water quality of the school (as Defendant Wilson claims[198]), the flyers

were consistent with the nature of the forum.  Defendant Wilson has already testified that flyers

announcing an upcoming PTSO meeting would fall within the purposes of the District's flyer

---

[190] Wilson Dep. 97:14-98:19; Bolden Dep. 15:19-21.
[191] Wilson Dep. 97:14-98:19; Bolden Dep. 15:19-21.
[192] Policy 1140.
[193] Wilson Dep. 107:10-15.
[194] Wilson Dep. 108:7-18.
[195] Wilson Dep. 109:13-110:3.
[196] Policy 1140.
[197] Williamson Dep. 63:7-13.
[198] Wilson Dep. 246:19-21.

policy,[199] and while the flyer policy itself does not define what is "relate[d] to school matters," the quality of the air the students breathe and the water they drink easily falls within this category under any common-sense reading of the standard. Whether the flyers pertained to a PTSO meeting or to the water or air quality of Flagg, barring distribution was unreasonable in light of the forum because in either case the flyers concerned "school matters," a subject matter permitted under the District's own definition of the forum.

Once government opens a limited public forum for speech, it is "bound to 'respect the lawful boundaries it has itself set.'" *Child Evangelism Fellowship of N.J., Inc. v. Stafford Tp. Sch. Dist.*, 386 F.3d 514, 526 (3d Cir. 2004) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). Here, Defendants' specified boundaries permitted visitors and parents to distribute literature "relate[d] to school matters." Because Ms. Williamson's flyers fell comfortably within that category, Wilson's restriction of Williamson's speech was unreasonable, and thus unconstitutional.

In sum, Wilson violated Williamson's right to free speech in three distinct ways: (1) by suppressing her literature distribution on the basis of viewpoint under a viewpoint-based policy; (2) by suppressing her speech under an unconstitutional District policy granting administrators unfettered discretion to suppress speech; and (3) by suppressing her speech unreasonably in light of the nature of the forum.

**B.  NPS Is Liable For The Suppression Of Williamson's Flyers Because NPS Delegated Final Decision-making Authority To Wilson And So His Actions And Policies Prohibiting Flyer Distribution Constitute Actions Of NPS, And Because The Suppression Occurred Pursuant To The District's Own Unconstitutional Policy.**

Policymakers cannot shield government from liability by simply delegating their authority to others. *Praprotnik*, 485 U.S. at 127 (plurality opinion). A municipal employee's unconstitutional act renders the municipal government liable when a final policy-maker delegates decision-making authority to that individual. *Hill*, 455 F.3d at 245. Even a single

---

[199] Wilson Dep. 96:7-13.

decision, moreover, can constitute official policy and result in municipal liability.  *Pembaur,* 475 U.S. at 480 (1986); *McGreevy*, 413 F.3d at 367-68.

Wilson has final authority over distribution of materials at the Flagg School, because Bolden delegated her final policy-making authority to him.  Bolden and Wilson testified that for purposes of Policy 1140, under which "all [distributed] material must be approved in advance by the State District Superintendent/designee,"[200] Wilson is Bolden's designee at the Flagg School and has the authority to approve materials for distribution, including materials distributed by parents.[201]  Most importantly, Wilson's decisions on these matters are final: they are not reviewed by any of his superiors.[202]  Because Wilson is the final policy-maker concerning parents' distribution of literature at Flagg, both Wilson's unconstitutional decision to prohibit Ms. Williamson from distributing flyers, and his unconstitutional policy of prohibiting the distribution of materials he does not consider "evidence-based," *see supra* Part II.A.1, are attributable to NPS; the District is thus liable for his unconstitutional actions.

NPS is also liable because, as discussed above, its flyer-distribution policy unconstitutionally vests unbridled and unreviewable discretion in school administrators.  In the seminal case first recognizing municipal liability for constitutional torts, the Supreme Court held that a municipality is liable when an unconstitutional action implements a policy "officially adopted and promulgated by that body's officers."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (finding municipality subject to liability for official policy requiring pregnant women to take unpaid leave before such leave became medically necessary); *see also Hill*, 455 F.3d at 245 (municipality liable for constitutional violation where "individual acted pursuant to a formal government policy"); *McGreevy*, 413 F.3d at 367 (same).  Because Wilson suppressed Ms. Williamson's speech pursuant to a facially unconstitutional policy, the municipality is liable regardless of whether it delegated final policymaking authority to Wilson.

---

[200] Policy 1140.
[201] Bolden Dep. 14:8-11, 15:19-25; Wilson Dep. 95:15-20, 97:14-98:1.
[202] Bolden Dep. 16:1-2, 16:13-15.

III.   **WILLIAMSON HAS ESTABLISHED AS A MATTER OF LAW THAT DEFENDANTS' CANCELLATION OF THE SPRING 2005 PTSO MEETINGS VIOLATED HER FIRST AMENDMENT RIGHT TO FREE SPEECH AND ASSEMBLY.**

   **A.  Wilson's Cancellation Of The March 17, 2005 PTSO Meeting And Constructive Cancellation Of Subsequent Meetings Were Unconstitutional Because They Were Viewpoint-Based, Unreasonable In Light Of The Nature Of The Forum, And Carried Out Pursuant To An Unconstitutional District Policy.**

   1.  The PTSO meeting cancellations were viewpoint-based.

As noted, regardless of the nature of the forum, the government may never suppress speech on the basis of a speaker's viewpoint.  *E.g., Lamb's Chapel*, 508 U.S. at 392-94; *Cornelius*, 473 U.S. at 806.  The suppression of Ms. Williamson's speech by cancelling the meetings of the organization of which she was president violates this basic constitutional limitation.  Defendants Silva and Wilson are the Superintendent's designees for the purposes of the District's policy on the use of school facilities by parent organizations; if these two individuals approve a request to use Flagg school facilities, then the requested use may occur.[203] Up until March 2005, the PTSO held monthly meetings at the school.[204]

On February 17, 2005, Ms. Williamson submitted a written request to hold PTSO meetings at Flagg on five dates that spring, including March 17.  Both Wilson and Silva approved that request.[205]

Yet Wilson and Silva cancelled the scheduled March 17, 2005, PTSO meeting.[206]  The reason for the cancellation, Wilson admitted, was "the climate that had begun to surface regarding Ms. Williamson and myself"[207] — a climate that, as previously described, *see supra* Part I.A.1, was characterized by Ms. Williamson's activism as PTSO President, Wilson's opposition to her activism and her candidacy for reelection as President, and a confrontation during which Ms. Williamson expressed her constitutionally-protected opinion that Wilson was

---

[203] Silva Dep. 36:23-37:2; Bolden Dep. 42:23-44-20; Wilson Dep. 75:14-76:6.
[204] Williamson Dep. 40:18-41:13.
[205] PTSO Facilities Application.
[206] Wilson Dep. 240:4-6; Silva Dep. 43:1-44:17.
[207] Wilson Dep. 240:7-9.

performing his job poorly.  (Wilson also cited Ms. Williamson's inability to be present due to her ban — an independently unconstitutional action, as explained above — as another reason for the cancellation.[208])

The cancellation of the March 17 meeting was not viewpoint-neutral because the reason for the cancellation was Defendants' distaste for a particular speaker — Ms. Williamson — and her views.  *See, e.g., City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750 (1988) (providing that a government official may be discriminating based on viewpoint when he "suppress[es] disfavored speech or *disliked speakers*" (emphasis added)); *see also United States v. Kalb*, 234 F.3d 827 (3d Cir. 2000) (same).  Other than his patently unreasonable and after-the-fact contention that Ms. Williamson had threatened to kill him, Wilson has offered no reason for the cancellation other than the "climate" between himself and Ms. Williamson and the fact that he had banned her from the building, itself an unconstitutional action.  Silva's recollection sheds no further light on the reason for the meeting cancellation beyond her vague recollection of some kind of unspecified "impropriety."[209]  Because dislike of a particular speaker is a viewpoint-based reason to suppress speech, and Wilson has admitted he cancelled the March 17 PTSO meeting because of the "climate" between himself and Williamson, Wilson's cancellations of the PTSO meetings was unconstitutionally viewpoint-based.

As a result of this cancellation, the PTSO began holding its meetings elsewhere, and membership declined precipitously as a result.[210]  Although the school did not formally cancel any of the other PTSO meetings scheduled for the spring, Wilson's treatment of Ms. Williamson and ongoing harassment made clear to her that she and the organization she led were unwelcome in the school.[211]  Thus, the March 17 cancellation had the effect of barring the PTSO from meeting at Flagg not only that night, but for the remainder of the spring, as well.

---

[208] Wilson Dep. 240:22-24.
[209] Silva Dep. 43:1-44:17.
[210] Williamson Dep. 39:1-40:11, 42:17 - 43:24, 151:9-18.
[211] Williamson Dep. 151:3-18; Williamson Decl. ¶ 45.

## 2.  The PTSO meeting cancellations were unreasonable in light of the nature of the forum.

Again assuming, as Defendants previously asserted, that Flagg is a limited public forum, *see supra* Part II.A, restrictions on speakers or content are permissible so long as they are viewpoint-neutral and reasonable in light of the nature of the forum.  *Donovan*, 336 F.3d at 225. Not only was the March 17 meeting cancellation viewpoint-based, as explained above; the cancellation was also unreasonable in light of the nature of the forum.

The nature of the forum is established by District policy and its approval of prior PTSO meetings.  Under NPS policy, a "school-connected organization," such as the PTSO,[212] may use school facilities when permission has been requested in writing and has been approved.[213]  As noted, *see* Part III.A.1, *supra*, the PTSO had properly requested and been approved to meet at the school on a series of dates including March 17, 2005.  Prior to March 17, 2005, the cancellation of previously-approved meetings was extremely rare,[214] and Wilson testified that other than the potential for violence or a threat of bodily harm, there was no other reason to cancel a meeting of a school-connected organization.[215]

In light of the nature of the forum, the cancellation of the PTSO meeting was unreasonable.  The forum was one in which the PTSO was welcome to meet by the terms of the District's policy and, in fact, the PTSO had met in the school for several years under that policy. .  Nothing had changed about the PTSO except the "climate" between the PTSO President and the school principal, arising from Ms. Williamson's speech critical of Wilson's performance. Although Wilson has suggested that Ms. Williamson had to be present for the meeting to occur, he ultimately admitted that the PTSO could meet in her absence.[216]  Wilson, moreover, did not try to contact any PTSO member to see if someone could assume charge of the building in Ms.

---

[212] Silva Dep. 34:10-12; Wilson Dep. 72:18-21.
[213] Policy 1230; Jeffries Cert., Ex. I (NPS Policy 1330, "Use of School Facilities") (hereinafter "Policy 1330").
[214] Silva Dep. 46:17-47:25 (recalling one other cancellation in 12 years).
[215] Wilson Dep. 89:21-90:1.
[216] Wilson Dep. 241:24-242:4.

Williamson's stead;[217] rather, he decided that because of his own personal feelings about the organization's president, the entire organization would be shut out of the school.  Because the forum was one in which the PTSO was not only welcome to meet but had regularly done so previously, Wilson's abrupt decision to cancel the March 17 meeting was unreasonable.

### 3.  NPS's school-facilities policy is facially unconstitutional because it grants Wilson unfettered discretion to approve the use of school facilities.

The same safeguards that prohibit unfettered licensing discretion concerning literature distribution also prohibit unfettered permitting discretion regarding the ability of citizens to assemble with one another.  *E.g.*, *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969) (striking down city ordinance permitting city commission to deny parade permits if "in its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused"); *see also Forsyth County v. Nationalist Movement*, 505 U.S. 123, 127 (1992) (striking down permitting scheme authorizing an administrator to adjust a fee "in order to meet the expense incident to the administration of the [permitting ordinance] and to the maintenance of public order in the matter licensed").

As previously noted, granting an official unfettered discretion to permit the exercise of First Amendment freedoms is constitutionally infirm regardless of the First Amendment forum involved.  *See supra* Part II.A.2.  This is equally true in the school context.  For example, the Fourth Circuit recently struck down, as conveying impermissibly broad discretion, a school policy providing that the decision to waive a fee for the use of District facilities was to be based on the "best interest of the district."  *Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1069-70 (4th Cir. 2006).

The text of the NPS facilities policy (Policy 1330) is undisputed: "The State District Superintendent may refuse to grant the use of a school building whenever in her judgment there is good reason why permission should be refused."[218]  The policy's only additional guidance is

---

[217] Wilson Dep. 245:16-246:7.
[218] Policy 1330.

that permission "shall not be granted for the advantage of any commercial or profit-making organization, private social functions, or any purpose that is prohibited by law."[219]  Yet there is no definition of "good reason why permission should be refused," nor is there any other standard guiding the Superintendent's judgment about when she should refuse permission.  Silva, one of the superintendent's designees for the purpose of this policy,[220] even testified that she "really do[es]n't know" what constitutes good reason to refuse permission.[221]

Policy 1330 does not contain any of the "narrow, objective and definite standards" required to prevent infringement of the First Amendment right to peaceably assemble. *Shuttlesworth*, 394 U.S. at 151.  NPS's policy broadly grants the superintendent the power to deny permits "whenever in her judgment there is good reason" to do so.  This vacuous standard is no better than the standards at issue in *Shuttlesworth* ("in its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused") or *Child Evangelism Fellowship* ("best interest of the district").  Even in the school context, as the Fourth Circuit succinctly summarized, "[s]peech is not to be selectively permitted or proscribed according to official preference."  *CEF-SC*, 470 F.3d at 1070.  Yet this is precisely what Policy 1330 permits.  Because this policy grants the decision-maker standardless discretion to decide when to deny the use of school facilities, the March 17 meeting cancellation pursuant to this policy was unconstitutional, and Ms. Williamson is entitled to summary judgment.

### B.  Silva Is Liable For The Cancellation Of The PTSO Meetings Because She Made The Cancellation Decision Together With Wilson.

As discussed, supervisory liability attaches when the supervisor participates in violating the plaintiff's rights.  *A.M.*, 372 F.3d at 586; *Baker*, 50 F.3d at 1190-91; *see supra* Part I.B.  Under this standard, Silva is liable for cancelling the PTSO meetings because she admits that she made the decision to cancel the March 17 meeting along with Wilson.[222]  This decision itself

---

[219] Policy 1330.
[220] Silva Dep. 36:23-37:2; Bolden Dep. 42:23-44-20.
[221] Silva Dep. 36:11-19.
[222] Silva Dep. 43:1-44:17.

abridged Williamson's right to free speech and assembly and also, as explained above, precipitated the constructive cancellation of the scheduled April, May, and June PTSO meetings. *See* Part III.A.1, *supra*.  By cancelling the March 17 meeting jointly with Wilson, Silva thus participated in violating Ms. Williamson's right to free speech and assembly and is liable for it.

### C.  NPS Is Liable For Cancelling The PTSO Meetings Because It Delegated Final Decisionmaking Authority To Wilson And/Or Silva, Who Jointly Made The Cancellation Decision, And Because The Decision Was Made Pursuant To The District's Unconstitutional Meetings Policy.

As discussed previously, a single act by an individual municipal employee renders the municipal government liable when "a final policy-maker renders the individual's conduct official for liability purposes by having delegated to him authority to act or speak for the government." *Hill*, 455 F.3d at 245; *McGreevy*, 413 F.3d at 367-68; *see supra* Part II.B.

Bolden delegated to Wilson and/or Silva her policy-making authority regarding meeting cancellation.  As Bolden testified, a principal's decisions on meeting cancellation are generally final, but subject to review by the Assistant Superintendent for the SLT if there is an objection.[223]  Thus, final policy-making authority to cancel meetings at Flagg is delegated to Wilson as principal or to Silva as Assistant Superintendent for SLT-IV, or to both.  Because the critical decision to cancel the March 17 PTSO meeting was made by Wilson and Silva together, the District is liable no matter which of them has final policy-making authority: whichever one of them has final authority acted on behalf of the District and so exposed the District to liability.

NPS is also liable because the decision to cancel the March 17 meeting was made under the District's unconstitutional meetings policy.  As discussed, this policy is unconstitutional because it vests unbridled discretion in school administrators to cancel meetings.  *See supra* Part III.A.2.  And as also discussed previously, a municipality is liable for unconstitutional actions made pursuant to its unconstitutional policy.  *See supra* Part II.B.  Because the District's

---

[223] Bolden Dep. 45:9-46:5.

meetings policy is unconstitutional, meetings cancellations executed under the policy subjects the District to liability.  *See Hill*, 455 F.3d at 245; *McGreevy*, 413 F.3d at 367.

**IV.   MS. WILLIAMSON IS ENTITLED TO SUMMARY JUDGMENT ON WILSON'S DEFAMATION COUNTERCLAIM BECAUSE THE FACTS CANNOT SHOW, BY CLEAR AND CONVINCING EVIDENCE, THAT THE ALLEGEDLY DEFAMATORY STATEMENTS WERE MADE WITH ACTUAL MALICE.**

Because Wilson is a public official, in order to prevail on his defamation claim, he must prove by clear and convincing evidence that Ms. Williamson acted with "actual malice."  *Lynch v. N.J. Educ. Ass'n*, 161 N.J. 152, 165 (1999) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)).[224]  Because the record evidence does not show actual malice, Ms. Williamson is entitled to summary judgment.

### A.  Wilson Is A Public Official Because He Holds An Important Public Office That Implicates The Critical Government Function Of Educating Children.

As the Supreme Court has concluded, public education is a function that "go[es] to the heart of representative government."  *Ambach v. Norwick*, 441 U.S. 68, 75-76 (1979).  Wilson is a public official because his position as school principal grants him substantial authority over the daily functioning of a public academic program, and how he exercises that authority is a vital subject of public debate.  *See, e.g.*, *Stevens v. Tillman*, 855 F.2d 394, 403 (7th Cir. 1988).  Given the First Amendment's strong commitment to uninhibited debate on public issues, *New York Times,* 376 U.S. at 270, discussion of a public-school principal's performance must not be chilled by fear of too-easily imposed defamation liability.  *NAACP v. Button*, 371 U.S. 415, 433 (1963) ("First Amendment freedoms need breathing space to survive[.]").  Indeed, given the importance of education in our society, *see generally Plyler v. Doe*, 457 U.S. 202 (1982); *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954), holding principals not to be public figures "would stifle public debate about important local issues."  *Johnson v. Robbinsdale Indep. Sch. Dist. No. 281*, 827 F.

---

[224] The other elements of defamation in New Jersey are: (1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher.  *DeAngelis v. Hill*, 180 N.J. 1, 12-13 (2004).

Supp. 1439, 1443 (D. Minn. 1993) (holding elementary school principal to be a public figure). For these reasons, the great majority of courts across the country have found that school principals are public officials for defamation purposes.  *See, e.g., Palmer v. Bennington Sch. Dist.,* 615 A.2d 498, 502-03 (Vt. 1992); *State v. Defley,* 395 So. 2d 759, 761 (La. 1981); *Reaves v. Foster,* 200 So. 2d 453, 456 (Miss.1967); *see also Williams v. Detroit Bd. of Educ.*, 2007 WL 3202992, at *5 (E.D. Mich. Oct. 30, 2007) (collecting cases and reflecting that, as of two months ago, approximately two-thirds of the relevant authority agrees that principals are public figures).

New Jersey law, moreover, strongly suggests that New Jersey follows the majority rule holding principals to be public figures.  Although New Jersey courts have not directly ruled on the public-figure status of principals, they have designated as public figures officials with significantly less weighty civic responsibilities.  State courts have liberally interpreted public-figure doctrine, holding that it covers a police lieutenant because of his important government responsibility and visibility in the community.  *See Costello v. Ocean County Observer*, 136 N.J. 594, 613-14 (1994).  Even more expansively, New Jersey's Appellate Division recently held that an arcade-game operator is a public figure because he operates within a "highly-regulated industry."  *Senna v. Florimont*, 2007 WL 1542017, *2-3  (N.J. App. Div. May 30, 2007), *cert. granted*, 192 N.J. 477.  Like a police lieutenant, a public-school principal has a vitally important government responsibility and is a visible figure in the community.  And if gaming is a "heavily-regulated" field, then surely the same is true of public education, which in New Jersey has been the subject of myriad legislative reform efforts, regulatory directives, and court battles over the past several decades.  *See generally Abbott v. Burke*, 153 N.J. 480, 490-92 (1998) (chronicling this lengthy history).  If an arcade-game operator is a First Amendment public figure, so too must be a school principal: a principal not only operates within a more regulated field, he also is publicly accountable for the care and development of children — a responsibility that inevitably implicates a host of complex political and social issues of enormous public import.

Here, Ms. Williamson's speech about Wilson's harassment of her, sexual and otherwise, involved precisely the kind of matters for which broad public discussion is warranted.  Ms.

Williamson criticized Wilson's performance in his professional role as principal.  The education and safety of children are matters of tremendous public importance.  If a principal is harassing and retaliating against a parent and community leader, and otherwise inappropriately discharging his official responsibilities, that is surely a matter that the community should be able to debate, freely and robustly.  Parents in the local community have a strong interest in knowing about and commenting on the behavior of the public officials who are educating and supervising their children.

For all of these reasons, this Court should hold, following the weight of authority and the New Jersey court's expansive approach to the definition of "public figure," that an elementary school principal is a public figure for purposes of defamation claims.

### B.  Wilson's Defamation Claims Fail As A Matter Of Law Because There Is No Clear And Convincing Evidence Of Actual Malice By Ms. Williamson.

Because Wilson is a public official, he must show by "clear and convincing evidence" that Ms. Williamson acted with actual malice — that she spoke either knowing her statement was false or with reckless disregard for its truth.  *Lynch*, 161 N.J. at 165.  Moreover, the New Jersey Supreme Court holds the "actual malice" standard to be a "subjective" one that concerns the speaker's "state of mind."  *Costello*, 136 N.J. at 615.  To find actual malice, the fact-finder must determine that the defamation defendant "in fact entertained serious doubts about the truth of the statement or . . . had a subjective awareness of the story's probable falsity."  *Id.*; *see also DeAngelis*, 180 N.J. at 18 (granting summary judgment against a defamation claim under the actual-malice standard where "plaintiff's evidence does not suggest that defendant doubted that his statements in the newsletter were true").  Any personal hostility between Ms. Williamson and Wilson arising out of Wilson's actions in banning her from the school are irrelevant to the actual-malice analysis, which concerns only the speaker's knowledge of the falsity of what was said, not the motivation for saying it.  *DeAngelis*, 180 N.J. at 17.

The evidence shows that Williamson's statements in her press conference were made without actual malice.  Williamson believed her statements to be true.  She previously told

several people about Wilson's sexual harassment, and recorded the incidents contemporaneously in her diary.  *See* Facts Section E.2, *supra*.[225]  This shows a lack of subjective malice and a genuine belief that Wilson had harassed her.  Simply put, the evidence "does not suggest that defendant doubted that [her] statements . . . were true."  *DeAngelis*, 180 N.J. at 18.

Additionally, Wilson has engaged in a long pattern of harassing conduct directed at women.  A Flagg teacher testified that Wilson sexually harassed her by gazing in a sexually provocative manner at her rear and clapping as she walked past him.[226]  And a parent attests that Wilson stared at the breasts of a 17-year-old girl.[227]  Wilson's history, moreover, is replete with instances of intimidation and physically domineering behavior toward women.  Several teachers report anxiety attacks and nausea, some requiring medical attention, after encounters with Wilson;[228] another attests to "heart palpitations" occasioned by Wilson's mere presence.[229]  And a star female teacher attests pointedly that she "feared for [her] safety whenever [she] was in Wilson's presence and purposefully avoided being in any setting in which [she] was alone with him."[230]  Wilson's history of similar misconduct thus lends further credence to Williamson's claims, and also confirms the truth of her statements at the press conference

Here, no reasonable jury could find by clear and convincing evidence that Williamson acted with actual malice.  Ms. Williamson's recounting of Wilson's harassment of her to others, her contemporaneous recording in her diary, and Wilson's history of harassment all lead to the conclusion that there was no reckless disregard for the truth.  Subjectively, Ms. Williamson herself believed the truth of her allegations,[231] and no reasonable jury would conclude otherwise.

---

[225] *See also* Williamson Diary, at 410 (entry for Apr. 27, 2005).

[226] Montague Dep. 7:23-8:24.

[227] Andrews Decl. ¶ 10.

[228] Muhammad Decl. ¶ 11; Montague Dep. 38:4-39:11.

[229] Fraser Decl. ¶ 7.

[230] Muhammad Decl. ¶ 11.

[231] Williamson Diary, at 410 (entry for Apr. 27, 2005); Williamson Decl. ¶ 30; Williamson Dep. 96:9-98:19; Williamson Statement to Municipal Court.

Because Wilson has not put forward clear and convincing evidence that Ms. Williamson spoke with actual malice, she is entitled to summary judgment.

**V.     MS. WILLIAMSON IS ENTITLED TO JUDGMENT ON WILSON'S MALICIOUS-PROSECUTION COUNTERCLAIM BECAUSE HE CANNOT ESTABLISH THE "SPECIAL GRIEVANCE" REQUIRED BY NEW JERSEY LAW.**

Malicious prosecution is "not a favored cause of action" in New Jersey, for "reasons deeply embedded" in the state's jurisprudence. *Penwag Prop. Co. v. Landau,* 76 N.J. 595, 597-98 (1978); *see also Lind v. Schmid*, 67 N.J. 255, 262 (1975). As the New Jersey Supreme Court has explained, "[t]he courts must be freely accessible to the people" and "extreme care" must be exercised to ensure a citizen's capacity to legally vindicate their rights is not chilled. *Penwag*, 76 N.J. at 598 (citation omitted). For these reasons, in addition to the standard malicious-prosecution elements,[232] a malicious-prosecution plaintiff who sues in response to the filing of a civil complaint must also show a "special grievance" — namely an interference to the plaintiff's liberty or property. *Penwag,* 76 N.J. at 598. The absence of this element is fatal to a malicious-prosecution claim, *Skeens v. Shetter*, 2006 WL 827782, *8 (D.N.J. Mar 30, 2006), and its absence here dooms Wilson's claim against Ms. Williamson.

A "special grievance" for these purposes is not merely a compensable injury — so the cost of retaining counsel and going to trial, and any mental distress involved in being sued, all fail to qualify as "special grievances." *Skeens*, 2006 WL 827782, at *8; *Penwag,* 76 N.J. at 598. Nor does being summoned to appear to defend a civil complaint constitute a loss of liberty sufficient to qualify as a "special grievance." *Skeens*, 2006 WL 827782, at *9-10 (applying *DiBella v. Borough of Beachwood,* 407 F.3d 599, 603 (3d Cir. 2005)); *Vickey v. Nessler*, 230 N.J. Super. 141, 147 (App. Div. 1989). And a reputational injury likewise fails to constitute a

---

[232] The standard elements are (1) that the criminal action was instituted by the defendant against the plaintiff, (2) that it was actuated by malice, (3) that there was no probable cause, and (4) that it was terminated favorably to the plaintiff. *See Lind*, 67 N.J. at 262.

"special grievance" for malicious-prosecution purposes. *Turner v. Wong*, 363 N.J. Super. 186, 205 (App. Div. 2003); *Brien v. Lomazow,* 227 *N.J. Super.* 288, 304 (App. Div. 1988).

Wilson's claim fails because he has not suffered any sort of "special grievance." The only kinds of injuries that he could show based on the record are appearing in court to defend Ms. Williamson's municipal claims and any reputational harm he may have suffered (though he does not allege any). But New Jersey courts have explicitly held that these do not qualify as "special grievances." Though the loss of the ability to practice one's profession does qualify as a "special grievance," *Turner*, 363 N.J. Super. at 205, Wilson remains in his job at the Flagg school, and his supervisors testified that he has not and will not suffer any adverse employment consequences on account of Ms. Williamson's claims.[233]

Although Wilson could hypothetically suffer adverse consequences in the future, the "special grievance" inquiry concerns actual consequences, not hypothetical ones: "a court must look at the 'reality' of what happened, rather than mere 'potentiality.'" *Turner*, 363 N.J. Super. at 206 (citing *Klesh v. Coddington*, 295 N.J. Super 1, 4 (App. Div. 1996)). Wilson has suffered no actual adverse professional consequences because of Ms. Williamson's municipal claims. Thus even if he could establish the other elements of malicious prosecution (which Ms. Williamson does not concede), his claim still fails legally for the lack of the "special grievance" required under New Jersey law.

**CONCLUSION**

For the reasons discussed herein, Plaintiff Veronica Williamson respectfully requests that this Court grant her motion for partial summary judgment.

---

[233] Silva Dep. 120:8-121:14; Bolden Dep. 48:1-15; Silveira Dep. 76:1-4.

Respectfully Submitted,

/s/ _____

Shavar Jeffries (SJ-0360)
Scott Michelman, admitted *pro hac vice*
Megan Grandinetti, D.N.J.L. Civ. R. 101.1(h)
Shelley Prysant, D.N.J.L. Civ R. 101.1(h)
Matthew Schueller, D.N.J.L. Civ. R. 101.1(h)

December 19, 2007